T.C. Memo. 2009-21

UNITED STATES TAX COURT

ESTATE OF MARJORIE DEGREEFF LITCHFIELD, DECEASED, GEORGE B. SNELL
AND PETER DEGREEFF JACOBI, COEXECUTORS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15882-05.                    Filed January 29, 2009.

John M. Olivieri and Mark D. Allison, for the estate.

Lydia Branche and Shawna Early, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, Judge:  Respondent determined a $6,223,176 Federal estate tax deficiency with respect to the estate of decedent Marjorie deGreeff Litchfield (the estate).

After agreement by the parties as to the fair market value of many assets of the estate, the issues for decision involve the percentage discounts that should be used for built-in capital

gains taxes, for lack of control, and for lack of marketability relating to the estate's minority interests in two closely held family corporations.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect on the October 17, 2001, alternate valuation date, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Decedent, Marjorie deGreeff Litchfield, died on April 17, 2001, a resident of Katonah, New York. At the time of filing the petition, George B. Snell, coexecutor of the estate, lived in New Jersey, and Peter deGreeff Jacobi, the other coexecutor of the estate, lived in North Carolina.

Under section 2032(a)(2) the estate elected the October 17, 2001, alternate valuation date (the valuation date).

Decedent's husband, Edward S. Litchfield, had died in 1984. On the date of his death, decedent's husband owned minority stock interests in two closely held family-owned corporations named Litchfield Realty Co. (LRC) and Litchfield Securities Co. (LSC).

In his will, a qualified terminable interest property election was made by decedent's husband under section 2056(b)(7), and the shares of LRC and LSC stock owned by decedent's husband transferred upon his death tax free under the marital deduction

to a lifetime income residuary trust in favor of decedent that had been established in 1984 (the trust).  For Federal estate tax purposes, under section 2044 decedent's estate is required to include in her gross estate the fair market value of the LRC and LSC stock owned by the trust.

LRC

In 1921 LRC was incorporated in Delaware as a C corporation to invest in and to manage farmland and other assets of the Litchfield family in Iowa.  From 1921 until 1984, all outstanding shares of LRC stock were owned by members of the Litchfield family.  After the trust was established in 1984, all outstanding shares of LRC stock were owned by members of the Litchfield family and by the trust.

As of the valuation date, LRC had approximately 18 shareholders, and decedent's estate owned directly and indirectly through the trust a total of 215,556 shares of LRC stock or 43.1 percent of the 500,000 shares of LRC stock outstanding.

The table below identifies LRC's board of directors and officers and briefly describes their investment experience as of the valuation date:

| Name | Director | Office Held | Investment Experience |
|------|----------|-------------|----------------------|
| Phillip Litchfield | Chairman | -- | -- |
| Kurt Olson | Yes | President | -- |
| Michael deMilt | Yes | Asst. treasurer | CPA and CFA |
| Ward Hunter | No | VP & treasurer | -- |
| John Kaufman | Yes | Asst. secretary | -- |
| Michael Larned | Yes | Asst. treasurer | Experienced investor |
| Christopher Litchfield | No | Secretary | Manager of hedge fund |
| Eric Litchfield | Yes | Asst. secretary | -- |
| Pieter Litchfield | Yes | Asst. treasurer | -- |
| Amy Webber | No | Asst. secretary | -- |

In 1921 when LRC was formed, Litchfield family members contributed to LRC farmland in return for shares of LRC stock. Over the years, LRC has leased its Iowa farmland to local farmers under share-lease agreements.[1]

As of the valuation date, LRC's assets consisted largely of farmland and marketable securities, and LRC also owned a subsidiary corporation that owned and operated a public grain elevator and that sold to farmers crop insurance and services

---

[1] Under Iowa share-lease agreements, LRC leases farmland to local tenant farmers, pays the farmers a share of the crop's planting costs, and receives a share of the proceeds when the crops are sold. Under Iowa law, restrictions apply to corporate ownership of farmland. Because LRC was formed for an agricultural purpose and because only Litchfield family members and the trust own shares in LRC, LRC qualifies as an Iowa family farm corporation and is permitted to own farmland. Iowa Code Ann. secs. 9H.1(8), 9H.4 (West 2001).

such as pesticide and fertilizer applications.  LRC's assets had a total net asset value of $33,174,196--$23,422,439 in farmland and related equipment and supplies and $9,751,757 in marketable securities.[2]

Although LRC's earnings each year reflected a marginal profit, in 2001 and for many prior years LRC had not been performing as well as expected by LRC management and shareholders.  During the 1990s mid-western farmland consistently had an annual income yield of over 4 percent of net asset value. LRC's farmland generally had an annual income yield of less than 1 percent.

---

[2] Per a stipulation of the parties, as of the Oct. 17, 2001, valuation date LRC's assets, liabilities, and net asset value are listed below:

| Assets: | Fair Market Value |
|---|---|
| Real estate | $22,671,055 |
| Marketable securities | 9,751,757 |
| Mineral rights | 319,942 |
| Subsidiary | 300,000 |
| Grain inventory | 244,122 |
| Prepaid expenses | 156,304 |
| Machinery, equipment, and vehicles | 132,782 |
| Cash | 39,414 |
| Co-op dividends | 31,970 |
| Receivables | (25,062) |
| Liabilities | (448,088) |
| Net asset value | $33,174,196 |

On January 1, 2000, LRC elected to convert from a C corporation to an S corporation. LRC management anticipated that pass-through taxation would result in increased profitability and better returns for LRC shareholders. However, if before January 1, 2010 (10 years from the first day of the first taxable year for which LRC elected S corporation status), LRC sold assets that it owned before its January 1, 2000, S election, LRC would incur corporate-level tax on the sale of those assets. See sec. 1374.

Before the valuation date, LRC management determined that straight cash leases with local farmers probably would provide a better return than share-lease agreements. However, because income from straight cash leases typically constitutes passive income and because LRC management did not want to trigger a corporate-level tax on passive income in excess of 25 percent of gross receipts, see sec. 1375, as of the valuation date LRC had not yet started using straight cash leases for its farmland.

Since 1921, LRC occasionally has sold portions of its farmland to raise cash.

LSC

In 1924 LSC was incorporated in Delaware as a C corporation to invest in marketable securities. Litchfield family members

contributed marketable securities they owned to LSC in return for shares of LSC stock.

As of the valuation date, LSC had approximately 50 shareholders, and all shareholders were members of the Litchfield extended family or the trust. As of the valuation date, decedent's estate owned directly and indirectly through the trust 38,808 shares of LSC stock or 22.96 percent of the 168,990 shares of LSC stock outstanding.

The table below identifies LSC's board of directors and officers and briefly describes their investment experience as of the valuation date:

| Name | Director | Office Held | Investment Experience |
|---|---|---|---|
| Michael Larned | Chairman | President | Experienced investor |
| Michael deMilt | Yes | VP & treasurer | CPA and CFA |
| John Kaufman | Yes | Secretary | -- |
| Christopher Litchfield | Yes | -- | Manager of hedge fund |
| Brian Morris | Yes | -- | -- |
| Ann Theurer | -- | Asst. secretary | -- |

Mr. Larned made recommendations to LSC management as to which stocks should be bought and sold and when.

As of the valuation date, LSC's assets included blue-chip marketable securities (e.g., AT&T, DuPont, and IBM) as well as

partnership and other equity investments, and LSC had a combined net asset value of $52,824,413.[3]

Over the years, LSC's investment strategy focused on maximizing cash dividends to shareholders, and cash dividends paid to LSC shareholders increased consistently.

No shares of LRC or LSC stock have ever been sold on the open market. LRC's and LSC's stock transfer policies generally discouraged stock redemptions and sales to outsiders.

On February 8, 2000, after LRC became an S corporation, LRC shareholders executed a shareholder agreement under which shareholders were prohibited from making stock transfers that, in the opinion of counsel for the corporation, would jeopardize LRC's S corporation status or its Iowa family-farm corporation status. Also, LRC maintained a right of first refusal to buy any LRC stock a shareholder wished to sell.

However, in the late 1990s Mr. deMilt (as an officer and director of LRC and LSC, as a trustee of the trust, and as part

---

[3] Per a stipulation of the parties, as of the Oct. 17, 2001, valuation date, LSC's assets, liabilities, and net asset value are listed below:

| Assets: | Fair Market Value |
|---|---|
| Marketable securities | $49,970,382 |
| Cash | 2,088,572 |
| Equity investments | 685,108 |
| Short-term investments | 100,000 |
| Federal income tax receivable | 1,500 |
| Liabilities | (21,149) |
| Net asset value | $52,824,413 |

of his duties with an investment management company which advised LRC and LSC) became concerned that the trust consisted of illiquid LRC and LSC shares and that decedent and several other elderly LRC and LSC shareholders did not have adequate cash for payment of estate taxes and other obligations upon their deaths. By the late 1990s Mr. deMilt and other officers of LRC and LSC contemplated sales of LRC and LSC corporate assets to finance stock redemptions whereby elderly LRC and LSC shareholders would receive cash needed to pay estate taxes and other obligations.

Mr. deMilt and LRC management requested studies of the feasibility of selling parcels of LRC farmland to outsiders. After the valuation date LRC sold a farm services subsidiary and shut down a public grain elevator that LRC had been attempting to sell for some time. By 2000 a number of mergers of public companies, stock of which was included in the LRC and LSC security portfolios, anticipated mergers, and corporate reorganizations that likely would follow from the mergers were anticipated to result in the sale or transfer by LRC and LSC of significant appreciated securities they held.

As of the valuation date, LRC's $33,174,196 net asset value included $28,762,306 in built-in capital gains--86.7 percent of LRC's total net asset value, and $19,789,772 of which related to the farmland and real property LRC owned and $8,972,534 of which related to marketable securities LRC owned.

As of the valuation date, LSC's $52,824,413 net asset value included $38,984,799 in built-in capital gains--73.8 percent of LSC's total net asset value.

As of the valuation date, the capital gains tax rate applicable to LRC and to LSC was between 35.5 and 39.1 percent. See sec. 1(i)(2).[4]

Estate Tax Return

In connection with the preparation of the estate's Federal estate tax return, the estate's valuation expert prepared a valuation report in which he discounted the estate's 43.1-percent stock interest in LRC by 17.4 percent for built-in capital gains taxes, by 14.8 percent for lack of control, and by 36 percent for lack of marketability, and in which he opined that the estate's interest in LRC had a valuation date fair market value of $6,475,000.

With regard to the estate's stock interest in LSC, the estate's valuation expert prepared a report in which he discounted the estate's 22.96-percent stock interest in LSC by 23.56 percent for built-in capital gains taxes, by 11.9 percent for lack of control, and by 29.7 percent for lack of

---

[4] As indicated, as an S corporation LRC would be subject to corporate capital gains taxes on the sale before Jan. 10, 2010, of assets owned before its Jan. 1, 2000, S election.  See sec. 1374.

marketability, and in which he opined that the estate's interest in LSC had a valuation date fair market value of $5,748,000.

On June 27, 2002, the estate's Federal estate tax return was filed, reporting the estate's respective interests in LRC and in LSC at the above values, a total taxable gross estate of $56,057,800, a total Federal estate tax liability of $22,396,609, and a $3,391 overpayment as a result of $22.4 million in estimated Federal estate taxes the estate had paid.

Respondent's Audit

On March 21, 2003, respondent's estate tax examiner mailed to the estate a request for documents and scheduled an April 17, 2003, initial audit meeting with the estate's coexecutors and legal representatives regarding the estate's Federal estate tax liability.  In his letter, respondent's estate tax examiner requested that the estate make available for his review LRC's and LSC's financial statements, tax returns, dividends paid, officers' salaries, shares outstanding, and shareholder names.

At the April 17, 2003, meeting the estate's representatives made available to respondent's estate tax examiner for review most of the financial information and documents requested. Because the financial information and documents made available to him were voluminous, at the conclusion of the meeting respondent's estate tax examiner did not take the documents with him, and he did not make copies of the documents he had reviewed.

Instead, respondent's estate tax examiner asked the estate's representatives to make copies of all of the documents and to mail the copies to him at his local Government office and to include in the mailing any documents not previously made available for review--apparently some financial documents relating to LRC and LSC. Soon thereafter, one of the estate's representatives had serious medical problems and was not able to supervise the preparation and mailing to respondent of the requested documents. However, other representatives of the estate stepped in and mailed to respondent's estate tax examiner copies of documents that had been requested. Transmittal letters included with the documents mailed to respondent identified and listed the documents that purportedly were included with the mailing--specifically listing the financial documents relating to LRC and LSC.

At the conclusion of the audit, on June 14, 2005, respondent issued to the estate a notice of deficiency in which respondent valued the estate's interests in LRC at $10,300,207 ($3,825,207 more than reported by the estate) and the estate's interest in LSC at $8,762,783 ($3,014,783 more than reported by the estate), and in which respondent determined a $6,223,176 Federal estate tax deficiency.

On April 5, 2007, in a meeting with respondent's and the estate's representatives just a few days before the start of the

trial herein, respondent's estate tax examiner informed the estate's representatives for the first time that he believed he had never received delivery from the estate of copies of certain LRC and LSC financial documents he had requested at the April 17, 2003, initial audit meeting.

## OPINION

### Burden of Proof

Under section 7491(a), the burden of proof on factual issues may shift from a taxpayer to respondent where a taxpayer complied with substantiation requirements, maintained records, cooperated with respondent's reasonable requests for witnesses, information, documents, meetings, and interviews, and introduced credible evidence. Sec. 7491(a)(1) and (2)(A) and (B); Rule 142(a)(2).

Respondent acknowledges that the estate generally complied with all substantiation, record maintenance, and cooperation requirements of section 7491(a)(2), but respondent argues that a shift in the burden of proof in this case from the estate to respondent on the factual valuation issues should not occur because the estate did not timely mail to respondent copies of certain requested LRC and LSC financial documents and because the estate has not introduced credible evidence as to the discounts to be applied to LRC's and LSC's net asset values.

With regard to the documents, respondent's estate tax examiner states that he was aware throughout the audit that he

had not received from the estate copies of some of the LRC and LSC financial documents he had requested in March of 2003, but he explains that he did not bring the documents again up with the estate's representatives, ask for them again, or complain about their nonproduction until just before the start of the April 2007 trial because one of the estate's representatives was ill, and he (the examiner) did not want to make a fuss or appear to be bullying the estate's representatives.

The estate's representatives assert that copies of all requested LRC and LSC documents were timely mailed to respondent's estate tax examiner in the spring of 2003 and that the failure of respondent's examiner to communicate to the estate's representatives any complaint about the estate's document production until just a few days before the start of the trial is inexcusable. The estate, of course, also contends that credible evidence has been submitted in support of the estate's claimed discounts to LRC's and LSC's net asset values.

In view of respondent's dilatory complaint, it is respondent's contention that is not credible as to the estate's alleged lack of production of LRC and LSC financial documents.

With regard to credible evidence on the factual discount issues, as discussed below, the trial evidence the estate submitted certainly so qualifies. The estate qualifies for the shift in the burden of proof under section 7491(a)(1) on the

factual issues as to the appropriate discounts for built-in capital gains taxes, for lack of control, and for lack of marketability.[5]

Other arguments respondent makes on the burden of proof issue were raised late, have been considered, and are found to be without merit.[6]

Valuation

For Federal estate tax purposes, the value of a decedent's gross estate includes the fair market value of all property owned by the decedent's estate. Sec. 2031; sec. 20.2031-1(b), Estate Tax Regs. Property to be included in the estate includes assets transferred tax free under a marital deduction from a predeceased spouse to a trust giving life income to the decedent. See sec. 2044.

---

[5] We note that in some cases involving the valuation of property where all of the operative facts are stipulated and are supplemented at trial only by expert witness testimony, placement of the burden of proof may be treated as irrelevant. See, e.g., Estate of Jelke v. Commissioner, T.C. Memo. 2005-131, vacated and remanded on other aspects of the valuation issue, 507 F.3d 1317 (11th Cir. 2007). In the instant case, not all operative facts were stipulated, important operative facts were hotly contested at trial, and the factual valuation issues in this case are subject to a shift in the burden of proof under sec. 7491.

[6] At trial or on brief, respondent for the first time argues that the estate's appraised value for some artwork, the value of which was settled before trial, should constitute a bar to a shift in the burden of proof on the LRC and LSC valuation issues.

Fair market value is defined as the hypothetical price at which a willing buyer and a willing seller, under no compulsion to buy or sell and both possessing reasonable knowledge of relevant facts, would enter into a hypothetical sale and purchase of the property to be valued. United States v. Cartwright, 411 U.S. 546, 551 (1973) (quoting sec. 20.2031-1(b), Estate Tax Regs.); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).

A determination of the fair market value of property generally involves questions of fact. CSX Transp. Inc. v. Ga. State Bd. of Equalizaton, 552 U.S. ___, ___ (2007), 128 S. Ct. 467, 473 (2007). Treasury regulations expressly provide that for Federal estate tax purposes the valuation of property involves a fact-based inquiry that is to take into account "All relevant facts and elements of value". Sec. 20.2031-1(b), Estate Tax Regs.

In CSX Transp. Inc., the U.S. Court of Appeals for the Eleventh Circuit had upheld as a matter of law a State-mandated particular valuation methodology for railroad real property. CSX Transp. Inc. v. Ga. State Bd. of Equalization, 472 F.3d 1281 (11th Cir. 2006). In reversing, the Supreme Court elaborated on the factual nature of property valuation issues as follows:

Valuation is not a matter of mathematics * * *.
Rather, the calculation of true market value is an
applied science, even a craft.  Most appraisers
estimate market value by employing not one methodology
but a combination.  These various methods generate a
range of possible market values which the appraiser
uses to derive what he considers to be an accurate
estimate of market value, based on careful scrutiny of
all the data available. * * *

* * * * * * * *

Appraisers typically employ a combination of
methods because no one approach is entirely accurate,
at least in the absence of an established market for
the type of property at issue.  The individual methods
yield sometimes more, sometimes less reliable results
depending on the peculiar features of the property
evaluated. * * *

* * * * * * *

Valuation of property, though admittedly complex,
is at bottom just "an issue of fact about possible
market prices," Suitum v. Tahoe Regional Planning
Agency, 520 U.S. 725, 741, 117 S. Ct. 1659, 137 L.Ed.2d
980 (1997), an issue * * * courts are used to
addressing. * * * [CSX Transp., Inc. v. Ga. State Bd.
of Equalization, 552 U.S. at ___, ___, 128 S. Ct. at
472-473.]

See also Gross v. Commissioner, 272 F.3d 333, 343 (6th Cir. 2001)

("choice of the appropriate valuation methodology for a

particular stock is, in itself, a question of fact"), affg. T.C.

Memo. 1999-254; Estate of O'Connell v. Commissioner, 640 F.2d

249, 251-252 (9th Cir. 1981) (trial court has "broad discretion

in determining what method of valuation most fairly represents

the fair market value * * * in view of the facts presented at

trial"), affg. in part and revg. and remanding in part T.C. Memo.

1978-191; Silverman v. Commissioner, 538 F.2d 927, 933 (2d Cir. 1976) (trial court's method for valuing stock did not deprive the donor of due process because "Such a [factual] determination is one that is entitled to be made on all the elements of the particular case" (quoting Heil Beauty Supplies, Inc. v. Commissioner, 199 F.2d 193, 195 (8th Cir. 1952), affg. a Memorandum Opinion of this Court)), affg. T.C. Memo. 1974-285.

As stated in Rev. Rul. 59-60, secs. 3-5, 1959-1 C.B. 237, 238-242, a hypothetical purchase price (i.e., fair market value) is to be determined through a commonsense application of all the relevant facts and circumstances with appreciation for the fact that valuation is an inexact science.

We emphasize that resolution of valuation issues typically involves an approximation--by the parties, by the experts, and also by the courts--and that a court's valuation need not be tied to specific testimony or evidence if it is within the range of values supported by the evidence. Estate of Davis v. Commissioner, 110 T.C. 530, 537 (1998); Peracchio v. Commissioner, T.C. Memo. 2003-280.

As indicated, different valuation methods may be used in calculating fair market value of stock in closely held corporations. The market method (or comparable company analysis) compares a closely held company with an unknown stock value to similar companies with known stock values. The income (or

discounted cashflow) method discounts to present value anticipated future income of the company whose stock is being valued. The net asset value (or balance sheet) method relies generally on the net asset value of the company. See Estate of Noble v. Commissioner, T.C. Memo. 2005-2.

With respect to stock in closely held real estate holding companies and investment companies such as LRC and LSC, the net asset valuation method is often accepted as the preferred method. Estate of Smith v. Commissioner, T.C. Memo. 1999-368; Estate of Ford v. Commissioner, T.C. Memo. 1993-580, affd. 53 F.3d 924 (8th Cir. 1995); Rev. Rul. 59-60 at sec. 5(b), 1959-1 C.B. 243.

The parties' experts used the net asset valuation method in their appraisals of the fair market value of the estate's minority LRC and LSC stock interests. The parties' experts apply discounts to LRC's and LSC's net asset values to reflect the substantial built-in capital gains taxes that, as of the valuation date, were associated with LRC's and LSC's appreciated assets. A hypothetical buyer would be willing to pay fair market value for the LRC and LSC stock, which would take into account and would reflect the millions of dollars in untaxed appreciation over the years in the values of LRC's and LSC's underlying assets. Knowledgeable buyers, however, also would negotiate discounts in the price of the stock to estimate, on the basis of current tax laws, the corporate capital gain tax liabilities due

on that very same appreciation when the assets are sold or otherwise disposed of by the corporation.  In other words, if a valuation of or price for corporate stock in a hypothetical sale is significantly affected by the untaxed appreciated value of the underlying corporate assets, the stock valuation or hypothetical stock price also should reflect the corporate capital gains tax liabilities that the appreciated assets carry with them and that will be paid by the corporation upon sale or other disposition of the assets.  See Eisenberg v. Commissioner, 155 F.3d 50, 57 (2d Cir. 1998), vacating and remanding T.C. Memo. 1997-483; Estate of Davis v. Commissioner, supra at 550; Estate of Dailey v. Commissioner, T.C. Memo. 2001-263; Estate of Borgatello v. Commissioner, T.C. Memo. 2000-264.

The parties' experts also apply discounts to LRC's and LSC's net asset values to take into account the estate's minority LRC and LSC stock interests and the lack of marketability of those interests.  The minority interest or lack of control involves the inability to control corporate action, select management, determine timing and amounts of distributions, arrange financing, and make decisions about liquidation, merger, and asset sales. The lack of marketability is based primarily on the fact that there is no public market for LRC and LSC stock.  See Mandelbaum v. Commissioner, T.C. Memo. 1995-255, affd. without published opinion 91 F.3d 124 (3d Cir. 1996).

We evaluate the opinions of the expert witnesses in this case, recognizing each expert's qualifications, but particularly in view of the evidence and facts relevant to the estate's minority LRC and LSC stock interests. See Parker v. Commissioner, 86 T.C. 547, 561 (1986).

As stated, the experts agree that as of the valuation date LRC and LSC net asset values were $33,174,196 and $52,824,413, respectively. Before discounts that the experts apply, the net asset values of the estate's respective 43.1- and 22.96-percent minority interests in LRC and LSC were $14,298,078 and $12,128,485.

The following chart summarizes the discounts to LRC's and LSC's net asset values for built-in capital gains taxes, for lack of control, and for lack of marketability that the estate's and respondent's experts use, and the chart sets forth the experts' bottom-line opinions of fair market value (FMV) of the estate's respective LRC and LSC minority stock interests:

|  | The Estate's Expert | Respondent's Expert |
|---|---|---|
| **LRC** | | |
| Net asset value | $33,174,196 | $33,174,196 |
| Net asset value of estate's 43.1% interest | $14,298,078 | $14,298,078 |
| Less discounts for: Built-in capital gains taxes | 17.4% | 2.0% |
| Lack of control | 14.8% | 10.0% |
| Lack of marketability | 36.0% | 18.0% |
| Opinion of FMV of estate's interest | $6,475,000 | $10,069,886 |

|  | The Estate's Expert | Respondent's Expert |
|---|---|---|
| **LSC** | | |
| Net asset value | $52,845,562 | $52,845,562 |
| Net asset value of estate's 22.96% interest | $12,133,341 | $12,133,341 |
| Less discounts for: Built-in capital gains taxes | 23.6% | 8.0% |
| Lack of control | 11.9% | 5.0% |
| Lack of marketability | 29.7% | 10.0% |
| Opinion of FMV of estate's interest | $5,748,000 | $9,565,535 |

The parties' experts are well qualified.

## The Estate's Expert

In calculating his discounts for built-in capital gains taxes relating to LRC's and LSC's appreciated assets, the estate's expert, among other things, reviewed minutes of LRC and

LSC board meetings and the history of LRC's and LSC's asset sales, and he talked with LRC's and LSC's officers and board of directors about plans for the sale of LRC's and LSC's corporate assets. The estate's expert projected holding periods and sale dates for LRC's and LSC's appreciated assets, and he estimated appreciation for the assets during the holding periods until the estimated sale dates, calculated the capital gains taxes that were estimated to be due on the sale of the appreciated assets on the projected sale dates, discounted to present value the capital gains taxes so calculated, and subtracted the present value of the projected capital gains taxes from the net asset values of LRC and of LSC, respectively.

The estate's expert's estimated annual turnover or sale rates for each class of asset were based on historical asset sales by LRC and LSC as well as on conversations with LRC's and LSC's officers and directors and minutes from board meetings indicating an intent to sell some assets in the near future, and he projected the number of years from the valuation date that would elapse before LRC's and LSC's assets owned on the valuation date would be sold.

For LRC, the estate's expert's asset turnover rate resulted in a projected average asset holding period of 5 years. As of the valuation date and using a capital gains tax rate of 38.8 percent, the present value of the estimated capital gains taxes

that likely would be due on LRC's assets, under the estate's expert's method, was $5,616,085 (17.4 percent of LRC's net asset value).

For LSC, the estate's expert's 12.5-percent annual turnover rate resulted in a projected holding period of 8 years and estimated capital gains taxes of $32,995,835. As of the valuation date and using a capital gains tax rate of 35.32 percent, the present value of LSC's estimated capital gains taxes that likely would be due on LSC's assets, under the estate's expert's method, was $12,455,695 (23.6 percent of LSC's net asset value).

To determine his lack of control discount for the estate's 43.1-percent stock interest in LRC, the estate's expert compared LRC's securities to closed-end funds[7] and compared LRC's farmland and other assets to real estate investment trusts (REITs) and real estate limited partnerships (RELPs). The estate's expert reviewed observed lack of control discounts applied to closed-end fund stock sales as well as to sales of REIT and RELP interests.

The estate's expert observed lack of control discounts for closed-end funds of 3.36 percent, with a median of 7.16 percent and a standard deviation of 17.73 percent. For REITs, lack of

---

[7] Closed-end funds are publicly traded corporations that, like LSC, invest in securities, pay dividends, and generally do not issue new shares of stock or redeem outstanding shares of stock.

control discounts observed ranged from 0 to 38.1 percent over a 10-year period, with the average discount during the year before the valuation date of 25.5 percent. For RELPs, for lack of control and lack of marketability a combined mean discount of 25 percent and a range of 10 to 50 percent was observed.

The estate's expert considered that a 43.1-percent interest holder would have some ability to force liquidation and to change LRC's policy and operation. The estate's expert considered LRC's current financial efficiency as measured by expenses to be similar to other investments of the same nature. However, the estate's expert considered LRC's historical returns to be substantially below those of other investments of a similar nature.

The estate's expert assigned to each of the above factors a value between -1 and 1, where -1 represented poor investor rights and 1 represented excellent investor rights. The factors regarding ability to force liquidation, ability to change LRC's policy and operation, and financial efficiency were each assigned values of 0 reflecting average investor rights, and the factor regarding LRC's historical returns was assigned a value of -1, reflecting poor investor rights.

Using a formula incorporating the observed lack of control discounts as well as the above factors relating to LRC (as represented by their average assigned values) and weighted for

LRC's combined asset classes, the estate's expert calculated a 14.8-percent lack of control discount for the estate's 43.1-percent stock interest in LRC.

In calculating his lack of control discount for the estate's 22.96-percent stock interest in LSC, the estate's expert compared LSC to closed-end funds and used the observed mean, median, and standard deviation for lack of control discounts relating to closed-end fund stock sales.

The estate's expert considered that a 22.96-interest holder would have little ability to force liquidation or to change LSC's policies and operations. The estate's expert also considered LSC's current financial efficiency and historical returns to be similar to what a 22.96-interest holder in LSC would expect on the basis of the behavior of comparable investments.

The estate's expert assigned to each factor values as described above. Thus, the factors regarding ability to force liquidation and to change LSC's policy and operation were each assigned values of -.5 reflecting less favorable than average investor rights, and the factors regarding financial efficiency and historical returns were each assigned values of 0 reflecting average investor rights.

Using the above formula, the estate's expert determined a lack of control discount for the estate's LSC stock interest, unweighted by asset class, of 12.23 percent. The estate's expert

then reduced the unweighted lack of control discount to account for LSC's small percentage of cash and short-term investments, resulting in an 11.9-percent lack of control discount for the estate's 22.96-percent interest in LSC.

In calculating his lack of marketability discount for the estate's minority stock interest in LRC, the estate's expert compared stock of LRC to restricted stock, including letter stock,[8] and reviewed observed lack of marketability discounts applied to restricted stock sales. The observed discounts ranged from 10 to 30 percent for larger companies with profitable operations and from 30 to 50 percent for small companies with characteristics indicative of a high degree of risk of loss.

The estate's expert considered that restrictions on LRC's share transferability as well as LRC's built-in capital gains would result in a relatively higher discount for lack of marketability. The estate's expert also considered expectations of future cashflow, liquidity of underlying assets, and LRC's small size.

The estate's expert assigned to each of the above factors values between -1 and 1. However, in his February 2007 report the estate's expert did not specify values by factor but instead gave average values for each class of assets that LRC owned. For

---

[8] Letter stock consists of stock that is restricted from trading on the open market for a specified period of time.

example, LRC's cash received an average value of .25, LRC's marketable securities received an average value of -.125, and LRC's farmland and farmland-related assets received an average value of -.5.

Using the formula described above, the estate's expert calculated a 36-percent lack of marketability discount applicable to the estate's LRC stock interest.

In calculating his lack of marketability discount for the estate's minority stock interest in LSC, the estate's expert compared stock of LSC to restricted stock with observed marketability discounts ranging from 10 to 30 percent for larger firms with profitable operations and from 30 to 50 percent for small companies with characteristics indicative of a high degree of risk.  The estate's expert considered restrictions on LSC's share transferability, expectations of future cashflow, and liquidity of LSC's underlying assets.

The estate's expert assigned to each of the above factors values between -1 and 1.  However, in his February 2007 report and similar to his treatment of LRC, the estate's expert did not specify values by factor but instead gave average values for each class of assets that LSC owned.  For example, LSC's cash and short-term investments were assigned a total high average value of .5, LSC's marketable securities were assigned a total neutral

average value of 0, and LSC's venture funds investments were assigned a low average value of -.25.

Using the formula described above, the estate's expert calculated a 29.7-percent lack of marketability discount for the estate's 22.96-percent LSC stock interest.[9]

Respondent's Expert

In calculating his discounts for built-in capital gains taxes, for each asset class within LRC and LSC respondent's expert used turnover rate estimates based solely on historical asset sales by LRC and LSC.

Respondent's expert did not talk to LRC or LSC management.

Respondent's expert used his turnover rates to project asset holding periods. Respondent's expert assumed a capital gains tax rate effective at the end of the holding period and calculated capital gains tax due on the assets, and respondent's expert discounted back to present value the projected capital gains taxes, treating the present value of the capital gains taxes as a liability, subtracting them from net asset values.

For LRC, respondent's expert's 1.86-percent asset turnover rate resulted in a projected asset holding period of 53.76 years.

---

[9] The estate's expert's 29.7-percent lack of marketability discount for the estate's LSC stock interest is significantly higher than the 21.4-percent discount therefor that the same expert witness used in 2000 in valuing for Federal gift tax purposes the same interest.

Because LRC, as a result of its S election, beginning in 2010 would no longer be required to pay corporate-level capital gains taxes, respondent's expert did not include in his calculation of a capital gains tax discount any capital gains taxes which under his method were projected to be incurred beyond 2009.

Respondent's expert multiplied a 38.8-percent capital gains tax rate by the $8,961,922 capital gains that, as of the valuation date, would be realized on an immediate sale of LRC's assets to yield a capital gains tax of $3,477,226. Respondent's expert then discounted a ratable portion of the $3,477,226 capital gains taxes per year for 9 years ($3,477,226 capital gains taxes divided by 53.76 years equals $64,681 due each year of the holding period) to yield a present value for the capital gains taxes of $358,116--an approximate 2-percent discount from LRC's net asset value.

For LSC, respondent's expert's 3.45-percent asset turnover rate resulted in a projected asset holding period of 29 years. Respondent's expert multiplied a 35.32-percent capital gains tax rate by the $38,984,854 capital gains that, as of the valuation date, would be realized on an immediate sale of LSC's assets to produce capital gains taxes of $13,769,450. Respondent's expert then discounted a ratable portion of the $13,769,450 capital gains taxes per year for 29 years ($13,769,450 capital gains taxes divided by 29 years equals $474,809 due each year of the

holding period) to yield a present value for the capital gains taxes of $4,107,147--an 8-percent discount from LSC's net asset value.

Regarding the lack of control and lack of marketability discounts, respondent's expert compared LRC and LSC with publicly traded entities, including those involving restricted stock, reviewed observed discounts applicable to the sale of interests in publicly traded entities, and, within a range of observed discounts that did not include the highest and lowest observed discounts, adjusted the discounts for LRC and LSC for factors specific to LRC and LSC.

According to respondent's expert, a discount for lack of control generally is required only if the buyer intends to make changes to the operation of the corporation. Because respondent's expert considered LRC's investments as performing well, respondent's expert concluded that a hypothetical buyer would make few changes to the operation of LRC and therefore that a buyer would not expect a large discount for lack of control.

In his analysis of LRC's marketable securities, respondent's expert, like the estate's expert, used closed-end fund data as a benchmark. However, because the standard deviation applicable to lack of control discounts for closed-end funds was more than 17 percent and the average discount was only 3.4 percent, respondent's expert "trimmed the mean", or eliminated from his

review the top and bottom 10 percent of observed lack of control discounts for closed-end funds, resulting in a trimmed average lack of control discount for closed-end funds of 5.2 percent.

Respondent's expert did not break down his discount analysis by asset class, as did the estate's expert. Instead, respondent's expert analyzed LRC's marketable securities (including cash and other equity investments) as a whole.

Respondent's expert considered that a 43-percent interest holder in LRC would have an above average ability to force liquidation or to change LRC's policy and operation. However, as stated, respondent's expert also considered that any shareholder in LRC would place little value on control because a shareholder would not desire to change operations. Further, respondent's expert considered that LRC's marketable securities yielded very good returns. Respondent's expert therefore concluded that a below-average lack of control discount of 5 percent was appropriate with regard to LRC's marketable securities.

With regard to LRC's farmland and related assets, respondent's expert reviewed a variety of published data. Respondent's expert noted 17- to 20-percent lack of control discounts observed in takeovers of public real estate companies, as reported in Mergerstat Review. In respondent's expert's view, discounts relating to takeovers generally are higher than discounts for normal sales activity, and the lack of control

discount applicable to LRC's farmland and related assets should be lower than discounts reported by Mergerstat Review.

Respondent's expert determined a 15-percent discount for lack of control relating to LRC's farmland and related assets. Respondent's expert pointed out that he agreed with the estate's expert's valuation in principle (but not in application) and that the 15-percent discount respondent's expert used for LRC's farmland and related assets was similar to the 15.7-percent discount that the estate's expert derived for the same farm-related assets of LRC.

Even though LRC's farmland and related assets constituted the bulk of LRC's net asset value, respondent's expert averaged the two above discounts to determine his 10-percent lack of control discount for LRC (i.e., 5 percent for LRC's marketable securities plus 15 percent for LRC's farm-related assets divided by 2 equals 10 percent).

To calculate a lack of control discount for LSC, respondent's expert again used closed-end fund data and a "trimmed mean" of 5.2 percent.  Because the estate's 22.96-percent interest in LSC was the single largest block of stock ownership in LSC, because respondent's expert considers that a potential buyer would not want to change the management of LSC, and because LSC's returns have been good, respondent's expert concluded that a below-average lack of control discount of

5 percent was appropriate for the estate's interest in LSC. In essence, respondent's expert opined that a hypothetical buyer of a minority interest in a closely held family corporation that is performing well "would place no value on control" and therefore that only a nominal lack of control discount should be applied to the estate's LSC stock interest.

To determine his lack of marketability discount for the estate's LRC stock interest, respondent's expert compared stock of LRC to restricted stock and reviewed observed lack of marketability discounts applied to restricted stock sales (including three studies of restricted stock sales from the late 1990s that the estate's expert did not review). Respondent's expert determined a 25-percent average observed lack of marketability discount for restricted stock sales.

Because sale prices for restricted stock may in his view include factors unrelated to marketability (e.g., liquidity of underlying assets and corporate distress), respondent's expert also reviewed private placement studies that compared discounts applied to registered, freely tradable private placements and unregistered, not freely tradable private placements. Respondent's expert considered the difference between the discounts applied to the two types of private placements to be indicative of a "true" discount for lack of marketability and

determined a range of 7.23 to 17.6 percent in observed lack of marketability discounts for private placements.

Respondent's expert then opined that three factors (LRC's dividend paying policy, the ability of a 43.1-percent interest holder in LRC to affect management, and the small likelihood that LRC would incur the cost of an initial public offering) suggested that a lack of marketability discount for the estate's interest in LRC should be below average.

Respondent's expert opined that an additional five factors (the slight difficulty an investor would encounter in determining LRC's net asset value, LRC's likelihood of continued returns, LRC's low management fees, the holding period necessary for LRC to be able to sell farmland and related assets, and LRC's willingness to redeem stock but potential inability to do so due to taxes that would be due on redemption) suggested a marketability discount that was only average but that LRC's restrictions on stock transferability suggested an above-average lack of marketability discount.

Using benchmarks established by restricted stock and private placement sales studies and adjusting for the above factors, respondent's expert determined that 18 percent was a reasonable below-average lack of marketability discount for the estate's shares of stock in LRC.

To determine a lack of marketability discount for the estate's minority stock interest in LSC, respondent's expert reviewed the same restricted stock and private placement data referred to above.  Because LSC's assets consisted mainly of marketable securities whose values were readily ascertainable and salable, respondent's expert opined that a lack of marketability discount should be average or below average.

Further, respondent's expert opined that LSC's policy of paying dividends, LSC's transparent financial conditions, LSC's long history of investments that provided returns, LSC's low management fees and competent management, the lack of formal legal restrictions on transferability of shares of stock, and the small likelihood that LSC would incur the cost of an initial public offering in the future all suggested that the lack of marketability discount for LSC should be below average. Respondent's expert concluded that 10 percent was a reasonable below-average lack of marketability discount to apply to the estate's shares of stock in LSC.

Analysis

On the facts and evidence before us, with regard to the built-in capital gains tax discounts, in view of the asset

valuation method employed by the parties and their experts, the highly appreciated nonoperating investment assets held by LRC and LSC as of the valuation date, and the C corporate tax liabilities to which LRC and LSC remain subject, we consider it likely that a willing buyer and a willing seller would negotiate and agree to significant discounts to net asset values relating to the estimated corporate capital gains taxes that would be due on the sale of LRC's and LSC's nonoperating assets.[10]

---

[10] Under the asset approach to the valuation of appreciated C corporation nonoperating assets, valuation discounts (apart from discounts for lack of control and marketability) for estimated built-in capital gains taxes have been the subject of much litigation. For cases denying built-in capital gains tax discounts for years before 1986, when former secs. 336 and 337 made imposition of capital gains taxes on appreciated corporate assets speculative, see, for example, Estate of Piper v. Commissioner, 72 T.C. 1062, 1087 (1979) and Estate of Cruikshank v. Commissioner, 9 T.C. 162, 165 (1947).

For cases allowing built-in capital gains tax discounts for years after amendment in 1986 of secs. 311, 336, and 337 by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 631, 100 Stat. 2269, under which corporations no longer could readily avoid capital gains taxes on appreciated assets, see, for example, Estate of Jelke v. Commissioner, 507 F.3d 1317 (11th Cir. 2007); Estate of Dunn v. Commissioner, 301 F.3d 339, 354 (5th Cir. 2002), revg. T.C. Memo. 2000-12, Estate of Jameson v. Commissioner, 267 F.3d 366, 371-372 (5th Cir. 2001), vacating and remanding T.C. Memo. 1999-43, Eisenberg v. Commissioner, 155 F.3d 50, 57-58 (2d Cir. 1998), vacating and remanding T.C. Memo. 1997-483, Estate of Davis v. Commissioner, 110 T.C. 530 (1998), Estate of Dailey v. Commissioner, T.C. Memo. 2001-263, and Estate of Borgatello v. Commissioner, T.C. Memo. 2000-264.

(continued...)

The estate's expert's assumptions relating to asset turnover estimates were based on more accurate data (namely, historical data, recent data, and conversations with management) than were respondent's expert's assumptions (namely, historical data and wrong assumptions as to management's plans).

As indicated, the estate's expert and respondent's expert projected that a certain percentage of LRC's assets, using their turnover estimates, would be sold each year. The estate's expert's projections for LRC of an average asset holding period

_____

[10](...continued)

In Estate of Jelke v. Commissioner, 507 F.3d at 1331, the U.S. Court of Appeals for the Eleventh Circuit held that--using the net asset method to value closely held C corporation stock and regardless of whether a sale or liquidation of corporate investment assets was contemplated as of the valuation date--an assumption, as a matter of law, was appropriate that all corporate investment nonoperating assets would be liquidated on the valuation date and therefore that a built-in capital gains tax discount equal to 100 percent of the built-in capital gains taxes that would be due on a sale of the appreciated assets should be allowed. To the same effect see the opinion of the United States Court of Appeals for the Fifth Circuit in Estate of Dunn v. Commissioner, supra at 352-353.

Herein, the estate's expert does not assume that LRC's and LSC's appreciated, nonoperating assets would be sold on the valuation date, and the estate does not ask us to apply a full dollar-for-dollar valuation discount for estimated built-in capital gains taxes. Therefore, we need not decide herein whether such an approach would be appropriate in another case where that argument is made.

of 5 years and for LSC a holding period of 8 years were based on historical asset sales and conversations with LRC management about potential asset sales in later years.[11]

Respondent's expert also projects that LRC's and LSC's corporate assets will be held for and sold off over a period of years, and respondent's expert discounts to present value, as of the valuation date, those estimated capital gains taxes, but respondent's expert does not take into account appreciation during the holding period that also likely will occur and that will be subject to taxes at the corporate level--what one expert has described as the tax-inefficient entity drag.  See Johnson &

---

[11] Under the estate's expert's turnover estimates for LRC (which we find credible and reasonable on the facts) LRC's assets owned on the valuation date are treated as sold during the period in which LRC will still owe corporate-level taxes on the sale of assets and therefore a built-in capital gains tax discount for LRC is appropriate.  The facts herein are unique and not all S corporations will be allowed a built-in capital gains tax discount.  See Dallas v. Commissioner, T.C. Memo. 2006-212.

Regarding LSC, the estate's expert's calculation of the built-in capital gains tax discount assumed a sale of assets in year 8 for ease of explanation.  If the estate's expert had made his capital gains tax calculation using a sale of 12.5 percent of LSC assets in each of years 1 through 8 after the valuation date, his calculation would have been more consistent with his projection of asset turnover (i.e., 12.5 percent of assets sold in each year resulting in a final asset sale in year 8) and also would have resulted in a slightly increased built-in capital gains tax discount.  We find no significant flaw in the estate's expert's simplification.

Barber, "Tax-Inefficient Entity Discount", 6 Valuation Strategies 20, 46 (Mar./Apr. 2003). On the facts presented to us, we believe that, as of the valuation date, a hypothetical buyer of LRC and LSC stock would attempt to estimate this extra corporate level tax burden on holding-period asset appreciation and would include the estimated cost or present value thereof in a built-in capital gains discount that would be negotiated between the hypothetical buyer and seller. We accept the estate's expert's estimates of his built-in capital gains discounts for LRC and LSC.[12]

With regard to the estate's LRC and LSC stock interests and on the basis of all of the facts and evidence before us, we conclude that the estate's 17.4 and 23.6 percent built-in capital

---

[12] One of respondent's own experts in another case acknowledges that he also would take into account holding-period asset appreciation in calculating appropriate valuation discounts to net asset value. See Estate of Dailey v. Commissioner, T.C. Memo. 2001-263. Also, in Estate of Borgatello v. Commissioner, supra, the parties included in their calculations of a built-in capital gains tax discount, and the Court included in its calculation thereof, estimated holding period asset appreciation and capital gains taxes thereon. We note that in Estate of Jelke v. Commissioner, T.C. Memo. 2005-131, the methodology used by the Court to calculate a discount for built-in capital gains taxes did not include holding-period asset appreciation. However, in Jelke the Court also emphasized the factual nature of the calculation of discounts for built-in capital gains taxes in a particular case and expressly stated that a valuation methodology used in one case was not binding on the Court in another case.

gains tax discounts are appropriate with respect to the estate's interests in LRC and LSC, respectively.

With regard to the lack of control discount for LRC, we note that both experts, using slightly different data sets, calculated similar lack of control discounts for LRC's farmland and related assets (the estate's expert--15.7 percent; respondent's expert--15 percent) and that both experts used lack of control discounts for LRC's securities lower than the lack of control discounts for LRC's farmland and related assets.

Both experts averaged their discounts for the farmland and for the securities to determine a lack of control discount for the estate's LRC stock interest. The estate's expert used a weighted average to account for the fact the LRC has significantly more farmland than securities. In contrast, respondent's expert used a straight average.

A straight average would have been appropriate if LRC's farmland and securities holdings were roughly equivalent. However, LRC's securities constituted a significantly smaller portion of LRC's total assets. If respondent's expert had accounted for LRC's unequal mix of assets by using a weighted average, respondent's expert's lack of control discount would

have been more applicable to LRC (and would have been closer to the estate's expert's 14.8-percent lack of control discount).

We conclude that the estate's expert's 14.8-percent lack of control discount for the estate's LRC minority stock interest is appropriate.

With regard to the lack of control discount for the estate's LSC stock interest, respondent's expert applied the same 5-percent discount as he applied to LRC's securities portfolio even though the estate's 22.96-percent stock interest in LSC was much smaller than the estate's 43.1-percent stock interest in LRC, whereas, the estate's expert used an increased lack of control discount for LSC (relative to the same type of assets--securities) to take into account the estate's smaller stock interest in LSC.

We conclude that the estate's 11.9-percent lack of control discount for the estate's minority stock interest in LSC is appropriate.

With regard to the lack of marketability discounts for both LRC and LSC, we consider it appropriate to weigh the assets by class. We, however, regard the estate's expert's respective 36-percent and 29.7-percent lack of marketability discounts, particularly when combined with the 14.8- and 11.9-percent lack

of control discounts we allow, to be high.  The estate's expert used some outdated data relating to restricted stock discounts. His discounts are higher than marketability discounts reflected in benchmark studies that included all components of a lack of marketability discount.

We also note that the estate's expert opined in another valuation report prepared for Federal gift tax purposes in March of 2000 that the estate's same 22.96-percent LSC minority stock interest was appropriately discounted for lack of marketability by 21.4 percent, significantly lower than the 29.7-percent lack of marketability discount he suggests herein and corroborative of the lack of marketability discount we conclude is appropriate.

We conclude that discounts for lack of marketability of 25 percent and 20 percent should apply to the estate's respective LRC and LSC minority stock interests.

The chart below summarizes the discounts for built-in capital gains taxes, for lack of control, and for lack of marketability that we find to be appropriate on the basis of the evidence and taking into account respondent's burden of proof in this case on these factual valuation issues--and our calculations of the respective $7,546,725 and $6,530,790 fair market values of

the estate's 43.1- and 22.96-percent respective LRC and LSC stock interests:[13]

LRC

| | |
|---|---|
| Net asset value | $33,174,196 |
| Net asset value of estate's 43.1% interest | $14,298,078 |
| Less discounts for: | |
| Built-in capital gains taxes | 17.4% |
| Lack of control | 14.8% |
| Lack of marketability | 25.0% |
| FMV of estate's interest | $7,546,725 |

LSC

| | |
|---|---|
| Net asset value | $52,845,562 |
| Net asset value of estate's 22.96% interest | $12,133,341 |
| Less discounts for: | |
| Built-in capital gains taxes | 23.6% |
| Lack of control | 11.9% |
| Lack of marketability | 20.0% |
| FMV of estate's interest | $6,530,790 |

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[13] As stated, the issues presented to us are the appropriate amounts of the respective three discounts. The precise mathematical application of the three discounts that we conclude are appropriate to the estate's shares of the net asset values of LRC and LSC is subject to the parties' Rule 155 calculations.