(Slip Opinion)             OCTOBER  TERM,  2007                    1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CSX TRANSPORTATION, INC. *v.* GEORGIA STATE BOARD OF EQUALIZATION ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 06–1287.   Argued November 5, 2007—Decided December 4, 2007

Under Georgia law, most commercial and industrial property is valued locally by county boards for tax purposes, but public utilities such as petitioner railroad (CSX) are initially valued by the State.  In 2002, respondent Georgia state board used a different combination of methodologies than it had in 2001 to determine that the market value of CSX's in-state real property had increased 47 percent, resulting in a significantly higher ad valorem tax levy.  CSX filed suit under the Railroad Revitalization and Regulatory Reform Act of 1976 (4–R Act or Act), which bars States from, *inter alia,* "[a]ssess[ing] rail transportation property at a value that has a higher ratio to the [property's] true market value . . . than the ratio" between the assessed and true market values of other commercial and industrial property in the same taxing jurisdiction, 49 U. S. C. §11501(b)(1), and authorizes the federal district court to enjoin the tax if the railroad ratio exceeds the ratio for other property by at least five percent, §11501(c).  CSX alleged that Georgia had grossly overestimated the market value of its in-state rail property while accurately valuing other commercial and industrial property in the State, so that CSX's property was taxed at a ratio of assessed-to-market value considerably more than 5 percent greater than the same ratio for the other in-state property.  Ruling that Georgia had not discriminated against CSX in violation of the 4–R Act because the State had used widely accepted valuation methods to arrive at its 2002 estimate of true market value, the District Court declared that the Act does not allow a railroad to challenge a State's chosen methodology if it is rational and not motivated by discriminatory intent.  The Eleventh Circuit panel affirmed, reasoning that the Act does not clearly state that

railroads may challenge valuation methodologies, and that such a
clear statement was required in light of the intrusion on state taxing
prerogatives.

*Held:* The 4–R Act allows a railroad to attempt to show that state meth-
ods for determining the value of railroad property result in a dis-
criminatory determination of true market value. Pp. 5–12.

(a) The Act's language is clear. States may not tax railroad prop-
erty at a ratio of assessed-to-true-market value higher than the ratio
for other commercial and industrial property in the same jurisdiction.
To apply the Act, district courts must calculate the true market value
of in-state railroad property. A court cannot undertake the compari-
son of ratios the statute requires without that figure at hand, see
*Burlington Northern R. Co.* v. *Oklahoma Tax Comm'n*, 481 U. S. 454,
461, and the determination of true market value may be affected by
the State's choice of valuation methods. Georgia's argument that
valuation methodologies must be distinguished from their applica-
tion, and that the Act allows courts to question only the latter, is re-
jected. There is no distinction between method and application in the
Act's language and no passage limiting district court factfinding as
the State proposes. Georgia's position is untenable given the way
market value is calculated. Valuation is not a matter of mathemat-
ics, but an applied science, even a craft. Most appraisers estimate
market value by employing not one methodology but a combination
because no one approach is entirely accurate, at least in the absence
of an established market for the type of property at issue. The indi-
vidual methods yield sometimes more, sometimes less reliable results
depending on the peculiar features of the property evaluated. Given
the extent to which the chosen methods can affect the determination
of value, preventing courts from scrutinizing state valuation method-
ologies would render §11501 a largely empty command, forcing dis-
trict courts to accept as "true" the market value estimate of the State,
one of the parties to the litigation. States, in turn, would be free to
employ appraisal techniques that routinely overestimate the market
worth of railroad assets. By then levying taxes based on those over-
estimates, States could implement the very discriminatory taxation
Congress sought to eradicate. Courts would be powerless to stop
them, and the Act would ultimately guarantee railroads nothing
more than mathematically accurate discriminatory taxation.

The State's warning that allowing railroads to introduce their own
valuation estimates based on different methodologies will inevitably
lead to a futile clash of experts, which courts will have no reasonable
way to settle, is not compelling, given that Congress was not simi-
larly troubled. Rather, Congress directed courts to find true market
value, however elusive, making that value the objective benchmark

for courts' evaluation. Property valuation, though admittedly complex, is at bottom just "an issue of fact about possible market prices," *Suitum* v. *Tahoe Regional Planning Agency*, 520 U. S. 725, 741, an issue district courts are used to addressing. In light of the statute's directive making true market value a factual question to be determined by the district court, what Georgia really seeks is to limit the types of evidence courts may consider as part of their factual inquiry. Had Congress intended to impose such a limit, it could easily have included language insulating the State's chosen methodologies from judicial scrutiny. It did not. Pp. 5–9.

   (b) The State argues that any interpretation of the Act allowing courts to question state valuation methods ignores the background principles of federalism against which the statute was enacted. Even if important state policy questions are intertwined with the selection of a valuation methodology, however, Congress clearly permitted courts to question such methodologies when it banned discriminatory assessment ratios and made true market value a question to be litigated in federal court. *Department of Revenue of Ore.* v. *ACF Industries, Inc.*, 510 U. S. 332, 343–344, distinguished. The Court also disagrees with Georgia's claim that the Court's interpretation will destroy the States' discretion to choose their own valuation methodologies. A State may use whatever method it likes, so long as the result is not discriminatory in violation of the Act. Pp. 9–12.

472 F. 3d 1281, reversed.

ROBERTS, C. J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 06–1287

CSX TRANSPORTATION, INC., PETITIONER *v.*
GEORGIA STATE BOARD OF
EQUALIZATION ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[December 4, 2007]

CHIEF JUSTICE ROBERTS delivered the opinion of the Court.

The Railroad Revitalization and Regulatory Reform Act prohibits States from discriminating against railroads by taxing railroad property more heavily than other commercial property in the State. Two decades ago, we held that this statute permits an aggrieved railroad to challenge a State's valuation of its property for tax purposes. *Burlington Northern R. Co.* v. *Oklahoma Tax Comm'n,* 481 U. S. 454, 462 (1987). Because the railroad in that case challenged only the State's *application* of its valuation methods, we expressly reserved the question whether a railroad may challenge the State's methods themselves. We answer that question today, and hold that railroads may challenge state methods for determining the value of railroad property, as well as how those methods are applied. The statute provides for nothing less.

I

Congress enacted the Railroad Revitalization and Regu-

latory Reform Act in 1976. 90 Stat. 31.[1]  Called the "4–R
Act" for brevity, the law aimed to halt the economic de-
cline of the rail industry by, among other means, barring
"discriminatory state taxation of railroad property." *Bur-
lington Northern, supra,* at 457; see also *Department of
Revenue of Ore.* v. *ACF Industries, Inc.*, 510 U. S. 332, 336
(1994).    The 4–R Act prohibits four separate forms of
discriminatory state taxation of railroads.[2]  Only the first
is at issue here: States, the Act provides, may not "[a]ssess
rail transportation property at a value that has a higher
ratio to the [property's] true market value . . . than the
ratio" between the assessed and true market values of
other commercial and industrial property in the same
taxing jurisdiction.    49 U. S. C. §11501(b)(1).    If the rail-
road ratio exceeds the ratio for other property by at least
five percent, the district court may enjoin the tax.

———————

[1] The portion of the Act that concerns us here, Section 306, was origi-
nally codified at 49 U. S. C. §26c (1976 ed.).  In 1978, Congress recodi-
fied it at 49 U. S. C. §11503 (1976 ed., Supp. II).  Congress recodified it
again in 1995, without substantive change, this time as §11501.  For
convenience, all references to the statute are to the text of §11501.

[2] Section 11501 reads, in relevant part:

"(b) The following acts unreasonably burden and discriminate
against interstate commerce, and a State, subdivision of a State, or
authority acting for a State or subdivision of a State may not do any of
them:

"(1) Assess rail transportation property at a value that has a higher
ratio to the true market value of the rail transportation property than
the ratio that the assessed value of other commercial and industrial
property in the same assessment jurisdiction has to the true market
value of the other commercial and industrial property.

"(2) Levy or collect a tax on an assessment that may not be made
under paragraph (1) of this subsection.

"(3) Levy or collect an ad valorem property tax on rail transportation
property at a tax rate that exceeds the tax rate applicable to commer-
cial and industrial property in the same assessment jurisdiction.

"(4) Impose another tax that discriminates against a rail carrier
providing transportation subject to the jurisdiction of the Board under
this part."

§11501(c).[3]

Petitioner CSX Transportation, Inc., is a freight rail carrier with multiple routes across the State of Georgia. As a consequence, it is subject to Georgia's ad valorem tax on real property. Under Georgia law, most commercial and industrial property is valued locally by county boards. Public utilities such as railroads, however, are initially valued by the State, which then certifies the proposed valuations to the county boards for adoption or alteration. In 2001, Georgia's State Board of Equalization, a respondent here, put CSX's ad valorem tax liability at $4.6 million. A year later, the State's appraiser used a different combination of methodologies to determine the market

———————

[3] Section 11501(c) provides:

"Notwithstanding section 1341 of title 28 and without regard to the amount in controversy or citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section. Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction. The burden of proof in determining assessed value and true market value is governed by State law. If the ratio of the assessed value of other commercial and industrial property in the assessment jurisdiction to the true market value of all other commercial and industrial property cannot be determined to the satisfaction of the district court through the random-sampling method known as a sales assessment ratio study (to be carried out under statistical principles applicable to such a study), the court shall find, as a violation of this section—

"(1) an assessment of the rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the assessed value of all other property subject to a property tax levy in the assessment jurisdiction has to the true market value of all other commercial and industrial property; and

"(2) the collection of an ad valorem property tax on the rail transportation property at a tax rate that exceeds the tax ratio rate applicable to taxable property in the taxing district."

value of CSX's in-state property.[4]  The result was a signifi-
cantly higher tax levy.  The State estimated the railroad's
2002 market value at approximately $7.8 billion, 472 F. 3d
1281, 1285 (CA11 2006), a 47 percent increase over the
previous year.  That brought the assessed value of CSX's
Georgia property to $514.9 million, for a final property tax
bill of $6.5 million.  Brief for Petitioner 15.

CSX filed suit in the United States District Court for the
Northern District of Georgia, contending that the State's
2002 tax assessment violated the 4–R Act.  The railroad
alleged that Georgia had grossly overestimated the mar-
ket value of its in-state property while accurately valuing
other commercial and industrial property in the State.
The result, according to CSX, was that its rail property
was taxed at a ratio of assessed-to-market value consid-
erably more than 5 percent greater than the same ratio for
the other property in the State.

To make its case, CSX submitted the testimony of its
own expert appraiser, who relied on a combination of
valuation methods different from those used by the ap-
praiser for Georgia.  The CSX appraiser calculated the
2002 market value of the railroad's property to be $6
billion, not the $7.8 billion figure used by the State.  472
F. 3d, at 1285–1286.  CSX maintained that the state ap-
praiser's valuation methodologies were flawed, and urged
the District Court to accept the market value estimated by
its expert as more accurate.

––––––––––

[4] Georgia assesses public utilities using the "unit rule."  Under this
rule, "an appraiser first determines the value of all assets of an entity,
regardless of location," then multiplies "by the percentage of the entity
located within [the State] to determine what portion of the value of the
company should be allocated to the state."  472 F. 3d 1281, 1283 (CA11
2006).  The parties agree the unit rule is the appropriate rule for
valuing CSX's property.  There are, however, numerous methods
available to value property under the unit rule, and many of these
methods themselves have multiple variations.  See *id.*, at 1284.

The District Court refused to do so. Following a bench trial, the court ruled Georgia had not discriminated against CSX in violation of the 4–R Act because the State had used widely accepted valuation methods to arrive at its estimate of true market value. 448 F. Supp. 2d 1330, 1341 (ND Ga. 2005). In the judgment of the District Court, the Act "does not generally allow a railroad to challenge the state's chosen methodology," as long as the State's methods are rational and not motivated by discriminatory intent. *Ibid.*

A divided panel of the Court of Appeals for the Eleventh Circuit affirmed. 472 F. 3d 1281 (2006). The majority reasoned that the "text of the Act does not clearly state that railroads may challenge valuation methodologies," and that such a clear statement was required in light of the intrusion on state taxing prerogatives. *Id.*, at 1289. Judge Fay dissented. *Id.*, at 1292. Recognizing the division on this question among the Circuits, compare *Consolidated Rail Corp.* v. *Hyde Park*, 47 F. 3d 473, 481–482 (CA2 1995) (a railroad may challenge a State's valuation methodology), and *Burlington Northern R. Co.* v. *Department of Revenue of Wash.*, 23 F. 3d 239, 240–241 (CA9 1994) (same), with *Chesapeake Western Ry.* v. *Forst*, 938 F. 2d 528, 531 (CA4 1991) (a railroad may not challenge a State's valuation methodology), and 472 F. 3d, at 1289 (decision below), we granted certiorari, 550 U. S. \_\_\_ (2007), and now reverse.

## II

"[T]he language of §1150[1] plainly declares the congressional purpose." *Burlington Northern*, 481 U. S., at 461. States may not tax railroad property at a ratio of assessed-to-true-market value higher than the ratio for other commercial and industrial property in the same jurisdiction. In order to apply the Act, district courts must calculate the true market value of in-state railroad prop-

erty.  A court cannot undertake the comparison of ratios the statute requires without that figure at hand.  We said as much in *Burlington Northern*: "It is clear from [the Act's] language that in order to compare the actual assessment ratios, it is necessary to determine what the 'true market values' are." *Ibid.*

We do not see how a court can go about determining true market value if it may not look behind the State's choice of valuation methods.  Georgia insists there is a clear and important distinction between valuation methodologies and their application.  As the State would have it, the statute allows courts to question only the latter. We find no distinction between method and application in the language of the Act, and see no passage limiting district court factfinding in the manner the State proposes. The total lack of textual support for Georgia's position is not surprising.  The dichotomy the State presses would eviscerate the statute by forcing courts to defer to the valuation estimate of the State, when discriminatory taxation by States was the very evil the Act aimed to ban.

Georgia's position is untenable given the way market value is calculated.  Valuation is not a matter of mathematics, as if the district court could prevent discriminatory taxation simply by doublechecking the State's assessment equations.   Rather, the calculation of true market value is an applied science, even a craft.  Most appraisers estimate market value by employing not one methodology but a combination.  These various methods generate a range of possible market values which the appraiser uses to derive what he considers to be an accurate estimate of market value, based on careful scrutiny of all the data available.  Appraisal Institute, The Appraisal of Real Estate 49 (12th ed. 2001).

Georgia's appraiser in the instant case, for example, used three different valuation techniques—the discounted cashflow approach, a market multiple approach, and a

stock and debt approach. He derived five values from these three methods, ranging from $8.126 billion to $12.346 billion. After selecting a number at the low end of the range and then subtracting another $400 million to account for intangible property not subject to ad valorem taxation, he settled on $7.8 billion as his final estimate of the true market value. 472 F. 3d, at 1284–1285.

Appraisers typically employ a combination of methods because no one approach is entirely accurate, at least in the absence of an established market for the type of property at issue. The individual methods yield sometimes more, sometimes less reliable results depending on the peculiar features of the property evaluated. As the variation in the state appraiser's market-value range reveals, different methods can produce substantially different estimates. W. Kinnard, Income Property Valuation: Principles and Techniques of Appraising Income-Producing Real Estate 52 (1971).

Given the extent to which the chosen methods can affect the determination of value, preventing courts from scrutinizing state valuation methodologies would render §11501 a largely empty command. It would force district courts to accept as "true" the market value estimated by the State, one of the parties to the litigation. States, in turn, would be free to employ appraisal techniques that routinely overestimate the market worth of railroad assets. By then levying taxes based on those overestimates, States could implement the very discriminatory taxation Congress sought to eradicate. On Georgia's reading of the statute, courts would be powerless to stop them, and the Act would ultimately guarantee railroads nothing more than mathematically accurate discriminatory taxation. We do not find this interpretation compelling. Instead, we agree with Judge Fay in dissent below: "Since the objective of any methodology is a determination of *true market value*, a railroad should be allowed to challenge the method[s]

used [by the State] in an attempt to prove that the result
. . . was not the *true market value* of its property." 472
F. 3d, at 1294.

The State agrees that it may not be possible to fix true
market value with any precision. But it draws a different
conclusion from this premise. Because any number of
estimates are plausible, Georgia argues, the court is as
likely to get an accurate result by verifying the application
of the State's methods—so long as they are broadly rea-
sonable—as it is by employing another method altogether.
The State warns that allowing railroads to introduce their
own valuation estimates based on different methodologies
will inevitably lead to a futile clash of experts, which
courts will have no reasonable way to settle. At least one
of the Courts of Appeals shares this concern. See *Chesa-*
*peake Western*, 938 F. 2d, at 532 ("There is no absolute
way to test the assertions of competing valuations . . ."
(internal quotation marks and brackets omitted)).

Congress was not similarly troubled. It directed courts
to find true market value, however elusive. It made that
value the objective benchmark for courts' evaluation of
state taxes on railroad property. True market value may
well not be a single, precise number, but Congress obvi-
ously believed it was susceptible to judicial inquiry and
that some approximations were better than others.

Georgia's grim prophecies notwithstanding, the inquiry
the statute mandates is not unfamiliar to courts. Valua-
tion of property, though admittedly complex, is at bottom
just "an issue of fact about possible market prices," *Sui-*
*tum* v. *Tahoe Regional Planning Agency*, 520 U. S. 725,
741 (1997), an issue district courts are used to addressing.
Railroad property is not frequently sold, but "determina-
tions of market value are routinely made in judicial pro-
ceedings without the benefit of a market transaction." *Id.*,
at 742. The District Court in this case made clear that it
knew how to find true market value: "In a more typical

case, the court would look at both [the railroad expert's] appraisal and [the State's] appraisal to determine the true market value of [the railroad]." 448 F. Supp. 2d, at 1338, n. 8. It refused to do so not because true market value is inherently elusive, but because it believed the Act did not allow it to question the State's methods.

In light of the statute's directive making true market value a factual question to be determined by the district court, what Georgia is really asking for is a limitation on the types of evidence courts may consider as part of their factual inquiry. If Congress had wanted to impose such a limit by reserving to States the prerogative of selecting which valuation methods may be used, it surely could have done so. Out of deference to the States, for example, §11501(c) provides that "[t]he burden of proof in determining . . . true market value [shall be] governed by State law." Congress could easily have included similar language insulating the State's chosen methodologies from judicial scrutiny. It did not. Like Oklahoma's argument in *Burlington Northern*, Georgia's position in this case ultimately "depends upon the addition of words to a statutory provision which is complete as it stands." 481 U. S., at 463. We decline to find distinctions in the statute where they do not exist, especially where, as here, those distinctions would thwart the law's operation.

III

Considering the clarity of the statute, we are tempted to leave the discussion at that. "When we find the terms of a statue unambiguous, judicial inquiry is complete . . . ." *Rubin* v. *United States*, 449 U. S. 424, 430 (1981). Georgia, however, lodges two objections to our interpretation, each of which merits a reply. First, the State argues that any interpretation of the Act allowing courts to question state valuation methods ignores the background principles of federalism against which the statute was enacted. The

majority below expressed a similar concern.  "The selec-
tion of a valuation methodology," it ruled, "is part of th[e]
fundamental power of a state [to tax]," 472 F. 3d, at 1288,
and should not be limited absent a clear statement from
Congress.  We have long held that the means States adopt
to collect their taxes "should be interfered with as little as
possible." *Dows* v. *Chicago*, 11 Wall. 108, 110 (1871).  But
we are persuaded that allowing railroads to challenge a
State's valuation methodologies has been clearly author-
ized by the terms of the 4–R Act.

    As an initial matter, we question Georgia's contention
that its selection of valuation methodologies is an impor-
tant state policy choice intimately connected to its tax
power.  Georgia does not prescribe any particular method-
ology as a matter of state law.  Its appraisers use different
methodologies in different combinations, as they see fit.
See 472 F. 3d, at 1284–1285 (explaining that the state
appraiser employed multiple methods and selected a value
according to his best judgment).  This suit, in fact, is the
result of an individual appraiser's decision to employ a
different combination of assessment techniques than that
used by his immediate predecessors.  The methods he
selected were his choice, not the dictate of any state stat-
ute or regulation.  *Ibid.*

    But even if important questions of state policy are, as
the Eleventh Circuit believed, "intertwined with the selec-
tion of a valuation methodology," *id.*, at 1288, judicial
scrutiny of those methodologies is authorized by the 4–R
Act's clear command to find true market value.  As we
explained above, the power to calculate true market value
necessarily includes the power to look behind a State's
valuation methods.  That the statute should vest this
authority in the Nation's courts is hardly surprising, given
Congress's conclusion that the States were assessing
railroad property unfairly.

    Our decision in *Department of Revenue of Ore.* v. *ACF*

*Industries, Inc.*, 510 U. S. 332 (1994), is not to the contrary. That case concerned a different provision of the 4–R Act—namely, the command in §11501(b)(4) preventing a State from "[i]mpos[ing] another tax that discriminates against a rail carrier providing transportation" in the taxing jurisdiction. This bar on facially discriminatory taxes, we held, did not prevent a State from exempting certain nonrailroad property from otherwise generally applicable ad valorem taxes. *ACF Industries*, 510 U. S., at 343. At the time the 4–R Act was adopted, a majority of States exempted one or more classes of business property from ad valorem taxation, "including business inventories, raw materials used in textile manufacturing, . . . and mechanics tools," to name just a few. *Id.*, at 344. The States had provided such property tax exemptions for years. In the face of this widespread and historical practice, we declined to read the 4–R Act to prohibit a type of tax exemption the text did not expressly mention. *Ibid.*

By contrast, we pointedly noted that the Act "prohibit[s] discriminatory tax rates and assessment ratios in no uncertain terms . . . and set[s] forth precise standards for judicial scrutiny of challenged rate and assessment practices." *Id.*, at 343. Georgia's claim that court review of state valuation methodologies is not authorized by a clear statement in the Act ignores the statute's explicit prohibition of discriminatory assessment ratios. A district court cannot accurately calculate or compare those ratios without determining true market value. Congress clearly permitted courts to question state valuation methodologies when it banned discriminatory assessment ratios and made true market value a question to be litigated in federal court.

Georgia also protests that our interpretation will destroy the States' discretion to choose their own valuation methodologies. We disagree. A State may use whatever method or methods it likes, so long as the result is not

discriminatory.  The Act does not prohibit the use of any valuation methodology.  It prohibits discrimination.  Far from requiring States to follow a particular method, we hold only that nothing in the statute prevents a railroad from attempting to show that the methods chosen by the State result in a discriminatory determination of true market value.

The judgment of the Court of Appeals for the Eleventh Circuit is reversed.

*It is so ordered.*