**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1726**

CSX TRANSPORTATION, INCORPORATED,

Plaintiff – Appellant,

v.

SOUTH CAROLINA DEPARTMENT OF REVENUE; RICK REAMES, III,
Agency Director of the South Carolina Department of Revenue,

Defendants - Appellees.

Appeal from the United States District Court for the District of South Carolina, at
Columbia. Margaret B. Seymour, Senior District Judge. (3:14-cv-03821-MBS)

Argued: January 26, 2017                           Decided: March 17, 2017

Before TRAXLER, DIAZ, and THACKER, Circuit Judges.

Vacated and remanded by published opinion. Judge Traxler wrote the opinion, in which
Judge Diaz and Judge Thacker joined.

**ARGUED:** Stephen Dorr Goodwin, BAKER, DONELSON, BEARMAN, CALDWELL
& BERKOWITZ, PC, Memphis, Tennessee, for Appellant. Milton Gary Kimpson,
SOUTH CAROLINA DEPARTMENT OF REVENUE, Columbia, South Carolina, for
Appellees. **ON BRIEF:** James W. McBride, BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, PC, Washington, D.C.; John C. von Lehe, Jr., Bryson M.
Geer, NELSON MULLINS, Charleston, South Carolina, for Appellant. Nicole M.
Wooten, SOUTH CAROLINA DEPARTMENT OF REVENUE, Columbia, South

Carolina; Thomas Parkin C. Hunter, SOUTH CAROLINA ATTORNEY GENERAL'S OFFICE, Columbia, South Carolina, for Appellees.

---

TRAXLER, Circuit Judge:

CSX Transportation, Inc. ("CSXT") appeals a judgment following a bench trial in its action brought under the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R Act"). *See* 49 U.S.C. § 11501(b)(4). Because we conclude that the district court's basis for awarding judgment against CSXT was invalid, we vacate the judgment and remand for further proceedings.

I.

A.    Determination of Property Tax for South Carolina Property

This case concerns the differences between how ad valorem taxes are determined in South Carolina for railroad property and how they are determined for most other commercial and industrial property. For each group, the determination is a multi-step process.

In the first step, all property subject to taxation in South Carolina is appraised for assessment purposes at its purported "true value," which is "fair market value."[1] S.C. Code § 12-37-930. The methods used for such appraisals vary, however. *See, e.g.*, S.C. Code § 12-4-540(B). South Carolina law specifically provides that railroads are assessed under the "unit valuation" method. *See* S.C. Code § 12-4-540(B). Under that method, an appraiser values the operating properties of an interstate company as an integrated whole

---

[1] Generally, the South Carolina Department of Revenue is charged with valuing all real and personal property of manufacturers, utilities, mining companies, and certain transportation companies, such as railroads, private carlines, and airlines. *See* S.C. Code § 12-4-540(A). County assessors value the remaining commercial, residential, and agricultural property. *See* S.C. Code § 12-37-90.

without regard to the value of its component parts. South Carolina generally calculates railroad system values based on the income the property is earning.[2] Once the total value of all of a railroad's real and personal property throughout the United States is determined in this fashion, the next step in the unit valuation process is to allocate the portion of the system value that represents the value of the railroad's property in South Carolina.[3] Finally, property that has already been taxed or that is tax-exempt is subtracted, yielding an "appraised value."

Once South Carolina has determined the appraised value of a taxpayer's property in the state, the next step in the tax-calculation process is the application of a statutory assessment ratio. *See* S.C. Code § 12-43-220. The South Carolina General Assembly has established statutory assessment ratios that apply to various types of property, and for railroad property, the ratio is 9.5%. *See* S.C. Code § 12-43-220(g). Applying the statutory assessment ratio to the appraised value of a taxpayer's property yields the "assessed value," against which the property tax rate is generally applied and property taxes are levied and collected.

However, in the case of property owned or leased by transportation companies for hire, including railroads, there is an additional step that precedes the application of the

_____

[2] By reviewing prior income statements, South Carolina can determine anticipated future profits and divide that by the weighted average cost of the capital.

[3] This allocation is done by examining a number of factors, including the percentage of the railroad's revenue that is derived in South Carolina, the percentage of its track miles located in South Carolina and the percentage of its investment in South Carolina.

property tax rate. To the assessed value of such property, South Carolina applies an "equalization factor," which is a reduction that these companies receive to help negate disparities between the fair market valuation of their properties and those of other commercial/industrial and manufacturing properties. *See* S.C. Code § 12-43-220(g). Once the appropriate equalization factor is applied, the resulting assessed value is distributed to the various South Carolina counties and cities in which the company operates and these entities in turn apply their local tax rates to determine the taxes the railroad must pay.

The primary focus of this appeal is the South Carolina Real Property Valuation Reform Act ("SCVA"), which the South Carolina General Assembly enacted in 2006. *See* S.C. Code §§ 12-37-3110 *et seq.* The SCVA generally limits increases in appraised values of commercial and industrial real properties to 15% within a particular five-year period.[4] *See* S.C. Code § 12-37-3140(B). The SCVA does not apply, however, to "[r]eal property valued by the unit valuation concept." S.C. Code § 12-37-3140(D). Because railroad property is valued by that method, railroads do not benefit from the 15% cap. It is that difference between the way South Carolina law treats railroad property and the way it treats other commercial and industrial property that is the subject of the present case.

B.    4-R Act

[4] The cap first went into effect for the 2007 tax year, which the Act designated as the "base year." S.C. Code § 12-37-3140(C) (internal quotation marks omitted). A cap remains in effect until the occurrence of an "assessable transfer of interest." S.C. Code § 12-37-3140(B).

5

In 1976, Congress enacted the 4-R Act to "restore the financial stability of the railway system of the United States," among other purposes. § 101(a), 90 Stat. 33. In order to achieve this goal, Congress targeted state and local taxation schemes that discriminate against railroads. *See Burlington N. R.R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 457 (1987). The portion of the 4-R Act at issue here, now codified at 49 U.S.C. § 11501, bars states and localities from engaging in four categories of tax-related conduct.

Under § 11501(b), states (or their subdivisions) "may not":

(1) [a]ssess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property[;]

(2) [l]evy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection[;]

(3) [l]evy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction[; or]

(4) [i]mpose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board . . . .

C.    Facts / Procedural History

CSXT is a common carrier by railroad operating in 23 states, including South Carolina. CSXT brought this action in federal district court against the South Carolina Department of Revenue and its director (collectively, the "State"). CSXT's complaint alleges that the State calculated the unit value of its property, applied the appropriate equalization factor, and arrived at an assessed value of $40,727,560 for the 2014 tax year.

6

CSXT alleges that in the period between the 2007 and 2014 tax years, South Carolina's appraisal of CSXT's real operating property has increased approximately 51%. CSXT claims that because CSXT is not allowed to benefit from the SCVA caps that apply to other commercial and industrial real property, the property taxes imposed for the 2014 tax year will discriminate against CSXT. CSXT's complaint requests a judgment declaring that excluding CSXT from the benefit of the SCVA's caps violates 49 U.S.C. § 11501(b)(4) ("(b)(4)"), which prohibits the imposition of "another tax that discriminates against a rail carrier." It also requests preliminary and permanent injunctions prohibiting the assessment, levying, or collection of taxes based on appraised values for CSXT's real property that have increased more than 15% during a five-year period.

On the same day that CSXT filed its complaint, it also filed a motion for preliminary injunction seeking to enjoin the assessment, levy, or collection of taxes based on an assessed value for its property for tax year 2014 that was greater than the amount the 4-R Act allowed. The State opposed CSXT's motion, contending that the SCVA's 15% cap was actually an "exemption" and thus that, under the reasoning of *Department of Revenue v. ACF Industries, Inc.* ("*ACF*"), 510 U.S. 332 (1994), the cap could not be challenged as discriminatory under (b)(4). However, after a hearing, the district court granted CSXT's motion for a preliminary injunction, concluding that *ACF* was factually distinguishable from the current case and that CSXT had presented sufficient evidence to give the court reasonable cause to believe the State had violated the 4-R Act.

7

The State then moved to dismiss the complaint for failure to state a claim on the basis that (b)(4), under which CSXT brought its challenge, does not apply to property taxes. *See* Fed. R. Civ. P. 12(b)(6). The district court denied the motion, and the case proceeded to a bench trial.

Following the trial, the district court granted judgment against CSXT on the basis that CSXT had not shown that it was challenging the imposition of a "tax," within the meaning of (b)(4). *See CSX Transp., Inc. v. South Carolina Dep't of Rev.*, No. 3:14-cv-03821-MBS, 2016 WL 3162178 (D.S.C. June 7, 2016). The court reasoned that CSXT was challenging the SCVA, which does not impose a tax but only caps "increases in appraised values" within the context of "an already-existing tax scheme." *Id.* at *4. The court added that although CSXT is precluded from challenging the SCVA under (b)(4), (b)(1) "provides an avenue for challenging an overall, unfavorable tax 'assessment.'" *Id.* at *5. Indeed, the court suggested that it was the possibility of a (b)(1) challenge that had justified its earlier grant of preliminary injunctive relief. *See id.*

In the end, however, the court concluded that CSXT "failed to meet its burden of proving discrimination under subsection (b)(4)" because "(b)(4) may not be used to challenge the 15% cap." *Id.* Having rejected CSXT's (b)(4) challenge on that basis, the court did not address the State's arguments that CSXT had not proven a (b)(4) violation, including arguments that the SCVA's 15% limit was essentially an exemption that could

8

not be challenged under the 4-R Act and arguments that CSXT had not suffered discrimination.[5] *See id.*

## II. Legal Analysis

In an appeal arising from a bench trial, "we may set aside findings of fact only if they are clearly erroneous," but we review legal conclusions *de novo*. *Williams v. Sandman*, 187 F.3d 379, 381 (4th Cir. 1999).

## A.

CSXT maintains that the district court erred in concluding that CSXT failed to challenge the imposition of a tax within the meaning of (b)(4). We agree.

As we have noted, (b)(4) bars states and divisions thereof from "[i]mpos[ing] another tax that discriminates against a rail carrier." 49 U.S.C. § 11501(b)(4). Because the words "impose" and "tax" are not defined in the 4-R Act, we look to the ordinary definition of those words.[6] *See CSX Transp., Inc. v. Alabama Dep't of Rev.* ("*CSX I*"), 562 U.S. 277, 284 (2011) (noting that "tax" is not defined in 4-R Act and thus giving the word its ordinary meaning). Here, it was undisputed that property taxes were to be imposed for the 2014 tax year based on the assessed value of CSXT's property. The district court's observation that the SCVA does not *itself* impose taxes is immaterial. *See id.* at 286 (explaining that railroad challenged the imposition of taxes within the meaning

---

[5] The court initially lifted the preliminary injunction but subsequently granted a post-judgment motion by CSX to reinstate the injunction pending CSXT's appeal to us. *See* Fed. R. Civ. P. 62(c).

[6] The common meaning of "impose" is "[t]o levy or exact (a tax or duty)." *Black's Law Dictionary* 873 (10th ed. 2014).

of (b)(4) when the railroad claimed the imposition of the taxes discriminated against it because other taxpayers were exempted from having to pay the taxes); *see also Burlington N. R.R. Co. v. Huddleston*, 94 F.3d 1413, 1417 (10th Cir. 1996) (holding that property tax violated (b)(4) when intangible personal property such as computer software was generally exempt from taxation but was not so for railroads), *overruled in part on other grounds by Alabama Dep't of Rev. v. CSX Transp., Inc.* ("*CSX II*"), 135 S. Ct. 1136, 1141 (2015); *Burlington N. R.R. Co. v. Bair*, 766 F.2d 1222, 1224 (8th Cir. 1985) (holding that property tax violated (b)(4) because vast majority of taxpayers received significant reductions in their assessed values for personal property but railroads did not; noting that "[t]his type of *de jure* discrimination clearly falls within the prohibition of" (b)(4)). CSXT's action plainly challenged the imposition of a tax.

B.

Assuming that CSXT did actually challenge the imposition of a tax, the State argues alternatively that CSXT was required to bring its challenge under (b)(1) and was precluded from challenging the tax under (b)(4). The State argues that because (b)(1) specifically concerns property tax assessment values while (b)(4)'s scope is more general, reading (b)(4) to apply to the tax would make (b)(1) superfluous. The State also claims that the Supreme Court's reasoning in *ACF* and certain language in *CSX I* favor adopting its narrow interpretation of (b)(4). The State suggests in fact that this reasoning was the driving force behind the district court's judgment against CSXT and urges that we affirm the judgment on this basis.

10

CSXT, on the other hand, argues that while it is possible that refusing to apply the SCVA cap to CSXT's property may *also* violate (b)(1), that potentiality has no bearing on the viability of its (b)(4) claim. Indeed, CSXT maintains that (b)(4) is the proper avenue for its challenge given the facts that CSXT alleges. CSXT points out that the basis for its challenge is *not* that the state's regime has produced *the result* that the railroad property is assessed at a higher percentage of its true value than is other commercial and industrial property – the circumstance (b)(1) addresses. Rather, CSXT alleges that the South Carolina tax scheme *on its face* singles out railroad property for less favorable *treatment* than other commercial and industrial property. Thus, CSXT argues that (b)(4), which prohibits discrimination, is the proper vehicle for its challenge.

We agree with CSXT. As we will explain, the type of conduct (b)(4) prohibits is significantly different from that which the other three (b) subsections address. For that reason, (b)(4) is *not* a general subsection that encompasses the more specific other three (b) subsections. And there is no danger that construing (b)(4) to cover the discrimination alleged here would render the other three (b) subsections superfluous. Thus, if CSXT can prove that the tax imposed was discriminatory, it will have demonstrated a (b)(4) violation. And, as we will explain, neither *ACF* nor *CSX I* suggests otherwise.

1.

We begin with the State's argument that (b)(4) should not be read to cover discrimination based on differences concerning property-tax assessments because (b)(1) specifically addresses that subject and would be rendered surplusage if (b)(4) were construed to apply.

11

Consideration of this argument requires a close examination of the (b)(1) and (b)(4) prohibitions. Initially, we note that the current language of § 11501(b) is the result of a recodification by Congress that included some technical amendments. *See CSX I*, 562 U.S. at 284 n.6. Because the amendments were not intended to change the statute's meaning, we refer to the original language of the Act for purposes of statutory interpretation. *See Richmond, Fredericksburg & Potomac R.R. Co. v. Department of Taxation, Commonwealth of Va.* ("*Richmond*"), 762 F.2d 375, 377 (4th Cir. 1985); *Clinchfield R.R. Co. v. Lynch*, 700 F.2d 126, 128 n.1 (4th Cir. 1983). The only word change that has much relevance to this appeal concerns (b)(4). In the 4-R Act as originally enacted, the subsection now codified as (b)(4) forbade the imposition of "*any other* tax which results in discriminatory treatment of a common carrier by railroad subject to this part," Pub. L. No. 94-210, 90 Stat. 54 (1976) (emphasis added), whereas the current version forbids the imposition of "*another* tax that discriminates against a rail carrier," 49 U.S.C. § 11501(b)(4) (emphasis added). Recognizing that Congress did not intend its alteration of the language to effect any substantive change, the Supreme Court has treated the current "another tax" language as "synonymous" with the original "any other tax" language. *See CSX I*, 562 U.S. at 284 n.6.

This housekeeping behind us, we now turn to the substance of (b)(1) and (b)(4). As we have recited, (b)(1) prohibits "'assess[ment] [of] rail transportation property at a value that has a higher ratio to the property's true market value . . . than the ratio' between the assessed and true market values of other commercial and industrial property in the same taxing jurisdiction." *CSX Transp., Inc. v. Georgia St. Bd. of Equalization*,

12

552 U.S. 9, 13 (2007) (quoting 49 U.S.C. § 11501(b)(1)) (alterations omitted). "If the railroad ratio exceeds the ratio for other property by at least five percent, the district court may enjoin the tax." *Id.* (citing 49 U.S.C. § 11501(c)). Accordingly, what (b)(1) prohibits, practically speaking, are bottom-line assessment outcomes. If the total assessment of rail transportation property divided by the true value of that property produces a higher ratio than does the total assessment of other industrial and commercial property divided by the true value of that property, (b)(1) has been violated. The reason for the difference in ratios, including the legitimacy of any policy justifications for treating these classes of property differently, does not matter. Nor does the fairness of comparing railroad property to other commercial and industrial property.[7] Rather, as is also true of (b)(2) and (b)(3), it is simply the bottom-line comparison of the very specific values those subsections describe that controls whether the provisions have been violated.

Subsection (b)(4), on the other hand, is a different animal entirely. We interpreted the scope of (b)(4) in *Richmond*, a case involving a challenge to a state corporate net income tax. In that case we emphasized (b)(4)'s breadth, observing that "it would be difficult to imagine statutory language that would be less needful of construction than the

---

[7] Thus, for example, when a railroad established, by way of a sales-assessment ratio study, that "the real properties of other commercial and industrial taxpayers were assessed at 72 percent of actual value, while the railroads were taxed at essentially full value," the railroad established a violation of § 306(1)(a) of the Act," which corresponds to subsection (b)(1) in the recodified version. *Clinchfield R.R. Co. v. Lynch*, 700 F.2d 126, 130 (4th Cir. 1983); *see id.* at 128 n.1.

13

'any other' language."[8]  762 F.2d at 379 (alteration omitted).  In contrast to (b)(1), (b)(2), and (b)(3), which pertain only to property taxes and prohibit only particular assessment and tax-ratio *outcomes*, (b)(4), we concluded, "was intended as a catchall provision designed to prevent *discriminatory* taxation of a railroad carrier *by any means*" and that "on its face, [(b)(4)] clearly and unambiguously prohibits *all forms of discriminatory taxation* of railroads."  *Id.* (emphasis added).  Given (b)(4)'s wide scope, we rejected the interpretation of the district court in that case that the "any other tax" language "include[d] only state and local property taxes and any other taxes enacted in lieu of [the] discriminatory property tax[es] prohibited by" (b)(1)-(3).  *Id.* at 378; *see id.* at 379-80.

The Supreme Court, too, has emphasized (b)(4)'s breadth and contrasted (b)(4) with the other, more narrowly focused (b) subsections.  For example, the Supreme Court has noted that unlike (b)(1)-(3), which "contain three specific prohibitions directed towards property taxes," *CSX II*, 135 S. Ct. at 1141, (b)(4) is a "catch-all" for taxes discriminating against railroads, 562 U.S. at 285; *see id.* (explaining that "(b)(4) speaks both clearly and broadly").  In *CSX II*, the Court also observed that (b)(4) broadly targets all types of tax "discrimination" against railroads.  *See* 135 S. Ct. at 1141-42.  The Court explained that "discrimination" in this context means unjustified differences in treatment between similarly situated taxpayers.  *See id.* at 1142-44.  And, the Court explained that, in contrast to (b)(4), liability under the other three (b) subsections does not require discrimination at all.  *See id.* at 1141-42.  Rather, liability under those subsections can be

---

[8] This became the "another" language in (b)(4) when the 4-R Act was amended.

14

based on mere differences in *outcomes* rather than differences in *treatment*, without regard to whether the railroad is similarly situated to the taxpayers it is comparing itself to and without regard to whether the difference in treatment is justified. *See id.*

In light of these differences, it is hardly surprising that the *CSX I* Court concluded that (b)(4) "is *not* a general or collective" prohibition that encompasses the specific provisions that precede it. 562 U.S. at 294 (internal quotation marks omitted). Rather, the four (b) subsections "prohibit[] . . . separate forms" of conduct, *CSX Transp., Inc.*, 552 U.S. at 12, and subsection (b)(4) is merely "one of several distinct and independent prohibitions," *CSX I*, 562 U.S. at 295 (alteration and internal quotation marks omitted).

From the stark differences in the nature of (b)(1)'s and (b)(4)'s prohibitions, we can plainly discern that the State's general/specific characterization is inapt and no construction we could give (b)(4) could render (b)(1) superfluous. Subsection (b)(1) serves to prohibit the particular outcomes it describes even if the taxpayers being compared are not similarly situated and even if the ratio difference is the result of legitimate policy justifications. Subsection (b)(4) would provide no relief for railroads in such a scenario.

2.

We also note that *ACF* does not support construing (b)(4) to preclude claims concerning a state's method of determining assessment values for property tax purposes. In *ACF*, several companies that leased railroad cars to railroads and shippers challenged an Oregon property tax as discriminatory under (b)(4) because Oregon law provided

15

exemptions for certain classes of business personal property.[9] *See* 510 U.S. at 335. The Court noted "that tax exemptions, *as an abstract matter*, could be a variant of tax discrimination." *Id.* at 343 (emphasis added). Nevertheless, the Court concluded that the structure of the statute "warrants the conclusion that subsection (b)(4) does not limit state discretion to levy a tax upon railroad property while exempting various classes of nonrailroad property." *Id.*

The Court's reasoning to reach this conclusion involved several steps. The Court began by noting that illegality under subsections (b)(1)-(3) is measured by comparing the taxation of railroad property to taxation of "commercial and industrial property." *Id.* at 341 (internal quotation marks omitted); *CSX I*, 562 U.S. at 290. The Court observed that the definition of "commercial and industrial property" includes only property "subject to a property tax levy," a phrase the Court interpreted as not including exempt property. *ACF*, 510 U.S. at 341 (internal quotation marks omitted); *CSX I*, 562 U.S. at 290. Based on Congress's exclusion of exempt property from the comparison, the Court determined that "railroads [could] not challenge property tax exemptions under" subsections (b)(1)-(3). *ACF*, 510 U.S. at 342; *see CSX I*, 562 U.S. at 290. And given that result, the Court reasoned that "[i]t would be illogical to conclude that Congress . . . would turn around and nullify [that] choice" by allowing (b)(4) to prohibit the very same type of

---

[9] Those classes included "agricultural machinery and equipment; nonfarm business inventories; livestock; poultry; bees; fur-bearing animals; and agricultural products in the possession of farmers." *ACF*, 510 U.S. 332, 335 (1994). "Standing timber [was] also exempt, but [was] subject to a severance tax when harvested." *Id.* And, Oregon also exempted motor vehicles and levied upon them only "a modest annual registration fee." *Id.*

exemptions.  *ACF*, 510 U.S. at 343; *see CSX I*, 562 U.S. at 290-91, 294.[10]  On this basis, the Court held that "a tax upon railroad property is [not] even subject to challenge under subsection (b)(4) on the ground that certain other classes of commercial and industrial property are exempt."  *ACF*, 510 U.S. at 338-39, *see id.* at 339-48; *CSX I*, 562 U.S. at 290-91.

The *ACF* Court rejected the contention that its construction of (b)(4) produced an "anomalous result."  *ACF*, 510 U.S. at 346; *see id.* at 347.  Most importantly, the Court emphasized that the case before it was not one "in which the railroads – either alone or as part of some isolated and targeted group – [we]re the only commercial entities subject to an ad valorem property tax."  *Id.* at 346.  The Court added that "[i]f such a case were to arise, it might be incorrect to say that the State 'exempted' the nontaxed property."  *Id.* The Court noted that, in that scenario, "one could say that the State had singled out railroad property for discriminatory treatment."[11]  *Id.* at 346-47.  The Court also added that "though some may think it unwise *to forbid discrimination in* tax rates and *assessment ratios* while permitting exemptions of certain nonrailroad property, the result

---

[10] The Court also discussed other considerations that it believed "reinforce[d] [its] construction of the statute."  *ACF*, 510 U.S. at 343.  The Court noted that the statute did not specifically "restrict state power to exempt nonrailroad property," *id.* at 344; federalism concerns favored preempting traditional state powers only when that was "the clear and manifest purpose of Congress," *id.* at 345 (internal quotation marks omitted); and the statute's legislative history did not indicate that Congress was particularly concerned about exemptions, *see id.* at 345-46.

[11] Because the tax before it did "not single out railroad property in that manner," however, the Court did "not decide whether . . . (b)(4) would prohibit a tax of that nature."  *Id.* at 347.

is not so bizarre that Congress could not have intended it." *Id.* at 347 (emphasis added and internal quotation marks omitted).

In this case, CSXT's claim is based on the very type of conduct that the *ACF* Court emphasized was *not* before it. CSXT claims that South Carolina's scheme explicitly and unjustifiably singles out railroads – as part of an isolated group – for less favorable *treatment* than other similarly situated taxpayers. If CSXT is correct, then the State's conduct would fit squarely within the Court's definition of discrimination, and there would be no reason why (b)(4) would not apply. *See CSX I*, 562 U.S. at 291 ("Giving subsection (b)(4) something other than its ordinary meaning, absent any structural reason to do so, would . . . contravene the expressed will of Congress."); *Huddleston*, 94 F.3d at 1417 (distinguishing *ACF* and holding that tax violated (b)(4) when intangible personal property such as computer software was generally exempt from taxation but was not exempt for public utilities, which included railroads), *overruled in part on other grounds by CSX II*, 135 S. Ct. at 1141.[12]

---

[12] Other circuits had held before *ACF* that precluding railroads from receiving tax benefits that the vast majority of other taxpayers received could constitute discrimination under (b)(4). *See Burlington N. R.R. Co. v. Bair*, 766 F.2d 1222, 1224 (8th Cir. 1985) (holding that property tax violated (b)(4) because vast majority of taxpayers received significant reductions in their assessed values for personal property but railroads did not; noting that "[t]his type of *de jure* discrimination clearly falls within the prohibition of" the predecessor to (b)(4)); *Ogilvie v. State Bd. of Equalization*, 657 F.2d 204, 209-10 (8th Cir. 1981) (holding that property tax violated (b)(4) when tax for utilities, car-line companies, pipeline companies and railroads was based in part on the assessed value of personal property but such property was exempt for other businesses).

We note that the State argues in passing that even if CSXT's claim is cognizable under (b)(4), CSX failed to present evidence sufficient to establish a prima facie case of a
(Continued)

18

3.

In support of its position that a property tax cannot violate (b)(4) based on the amount of the assessment on which the tax is based, the State also relies on particular language from the Supreme Court's *CSX I* opinion. In that case, a railroad alleged a (b)(4) violation "because rail carriers, but not motor or water carriers, must pay Alabama's sales and use taxes on diesel fuel." *CSX I*, 562 U.S. at 283. Based on an extension of *ACF*'s reasoning, the Eleventh Circuit had concluded that (b)(4) could not be the basis for challenging *non*-property-tax exemptions either and thus held that the railroad's (b)(4) challenge could not proceed. *See id.* at 282-83. The Supreme Court granted certiorari and considered two questions: whether CSXT was "challenging 'another tax' within the meaning of [(b)(4)] . . . [a]nd, if so, [whether] that tax [might] 'discriminate' against rail carriers [within the meaning of (b)(4)] by exempting their competitors." *Id.* at 284.

Regarding the first issue, the Court considered an argument by the defendants and amici that (b)(4) did not apply to all types of taxes but rather applied "only to the gross-receipts taxes . . . known as 'in lieu' taxes." *Id.* at 285. The Court rejected that argument, explaining that although the Act does not specifically define "tax," the ordinary definition of the word includes "multiple forms of taxation on property, income, transactions, or activities." *Id.* The Court concluded that "'[a]nother tax' . . . is best

---

(b)(4) violation. We conclude that this is an issue that would be best addressed by the district court on remand in the first instance, and we express no view on the merits of the parties' respective positions.

19

understood to refer to all of these." *Id.* The Court added that "more precisely," the language should be understood "to encompass any form of tax a State might impose . . . *except the taxes on property previously addressed in subsections (b)(1)-(3)*" since "another tax" was "a catch-all." *Id.* (emphasis added).

The State now seizes upon the language emphasized above, contending that it means that railroads cannot challenge a tax under (b)(4) if the tax possibly could have been challenged under (b)(1).[13] That is not how we read the Court's language, however. As we have noted, one of the two issues presented in *CSX I* was whether *non*-property-tax exemptions could be the basis for a (b)(4) challenge. *See CSX I*, 562 U.S. at 283-84. This issue required the Court to discuss *ACF* at length and decide whether to extend its reasoning to apply to non-property taxes. *See id.* at 282-83, 289-96. Given that context, the Court's "taxes on property previously addressed in subsections (b)(1)-(3)" language in *CSX I* appears fairly clearly to refer to *ACF*'s decision that (b)(4) should not be construed to prohibit an aspect of a tax scheme that the other (b) subsections were designed to allow. *See ACF*, 510 U.S. at 343.

The State's suggestion that the *CSX I* Court intended its language to mean that a railroad cannot challenge a tax under (b)(4) if the tax also might conceivably violate one of the other (b) subsections is implausible for several reasons. Because the taxes at issue in *CSX I* were use and sales taxes, they could not possibly have violated (b)(1), (2), or (3), which address property taxes only. *See CSX I*, 562 U.S. at 291. Thus, the Court had

---

[13] It is worth noting that CSXT has not alleged facts sufficient to establish a (b)(1) violation and the State denies that such a violation occurred.

20

no reason to decide, or even raise, the issue of whether a railroad would be precluded from challenging a tax under (b)(4) that might be challenged under one of the other (b) subsections. Moreover, had the Court intended to announce the new (b)(4) exception that the State claims it created with this language, one certainly would have expected the Court to have explained (1) why the Court even raised that issue; (2) the legal basis for the new exception; and (3) the tension that would exist between the new exception and the *ACF* Court's suggestion that (b)(4) might be violated if a railroad was "singled out" for unfavorable treatment in the form of inability to benefit from property tax exemptions given to other taxpayers. *ACF*, 510 U.S. at 347. That the Court did not do any of these things very strongly indicates that it did not intend to break the new ground the State contends it did.[14]

Moreover, had Congress intended that a railroad would need to prove the absence of a violation of (b)(1), (2), or (3) in order to prove a (b)(4) violation, Congress could have conveyed that intention quite easily. For example, instead of simply forbidding "the imposition of any other tax which results in discriminatory treatment of a common carrier by railroad,"[15] Congress could have added, "and which does not violate any other subsection herein." The State may suggest that Congress intended the words "any other" to serve this same function. But, in our view, the much more likely reason for Congress's

---

[14] Not only did the Court not acknowledge any tension between its language and *ACF*, it expressly stated that it "st[oo]d foursquare behind [its] decision in [*ACF*]." *CSX I*, 562 U.S. 277, 290 (2011).

[15] This is the language of the original 4-R Act that corresponds to (b)(4).

21

reference to "[t]he imposition of any other tax which results in discriminatory treatment of a . . . railroad" was simply to acknowledge that the other (b) subsections already prohibited some taxes that discriminate against railroads. Indeed, we have held that Congress did not intend the "any other" language to be limiting at all. *See Richmond*, 762 F.2d at 379 (explaining that "it would be difficult to imagine statutory language . . . less needful of construction than the 'any other' language" and holding that subsection (b)(4) "on its face, clearly and unambiguously prohibits all forms of discriminatory taxation of railroads" (alteration and internal quotation marks omitted); *see also CSX I*, 562 U.S. at 285 ("The phrase 'another tax' is a catch-all."). We certainly do not read the "any other" language as adding an additional element to a (b)(4) violation.

## III. Conclusion

In our view, the application of (b)(4) in this case will be fairly straight-forward. Congress designed (b)(4) to prohibit taxes that discriminate against railroads. CSXT alleges that if it is not allowed to benefit from the SCVA cap, its 2014 property tax will be just such a tax. If CSXT is correct, it should prevail. If not, it should lose. There is no basis for precluding CSXT from proving the claim it alleges – discrimination – and requiring CSXT instead to fit its challenge into a provision that does not even address discrimination and that requires proof of facts CSXT has not even alleged. Because the district court granted judgment against CSXT without ever reaching the question of whether the challenged tax was discriminatory, we vacate the judgment and remand to the district court for further proceedings.

*VACATED AND REMANDED*

22